# No. 22-11470-A

## IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

### EDWARD J. DIMARIA,

*Movant/appellant,*

v.

### UNITED STATES OF AMERICA,

*Respondent/appellee.*

**On Appeal from the United States District Court for the Southern District of Florida**

**APPELLANT EDWARD J. DIMARIA'S INITIAL BRIEF**

**RICHARD C. KLUGH, ESQ.**
**Counsel for Edward DiMaria**
**40 N.W. 3rd Street, PH 1**
**Miami, Florida 33128-1838**
**Tel. (305) 536-1191**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### Edward J. DiMaria v. United States, Case No. 22-11470-A

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Becerra, Hon. Jacqueline, United States Magistrate Judge

Bergendahl, John E., Counsel for Appellant

Covert, Jason M., Department of Justice Attorney

Fajardo, Ariana, Former United States Attorney

Gonzalez, Juan Anthony, United States Attorney

Klugh, Richard C., Counsel for Appellant

Moore, Hon. K. Michael, United States District Judge

Rubio, Lisa Tobin, Assistant United States Attorney

Sanders, Jeremy R., Assistant United States Attorney

Scruggs, Emily C., Department of Justice Attorney

**C1 of 1**

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Appellant respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF CITATIONS ................................................... iv

STATEMENT OF JURISDICTION........................................................ vi

STATEMENT OF THE ISSUES ..................................................1

STATEMENT OF THE CASE ..............................................................2

    Introduction............................................................................................2

    Course of Proceedings and Disposition in the District Court .......................2

    Statement of the Facts..........................................................................7

    Standard of Review...........................................................................12

SUMMARY OF THE ARGUMENT ..................................................12

ARGUMENT AND CITATIONS OF AUTHORITY .........................................16

I:   Whether the district court erred in denying, without an evidentiary hearing, Mr. DiMaria's claim that counsel was ineffective for failing to adequately investigate his case.................................................................................16

II:  Whether the district court erred in denying without an evidentiary hearing, Mr. DiMaria's claim that the counsel was ineffective during the plea negotiation stage by failing to advise him on how financial loss is calculated .....30

CONCLUSION ..............................................................34

CERTIFICATE OF COMPLIANCE ..................................................35

CERTIFICATE OF SERVICE ..........................................................35

## <u>TABLE OF CITATIONS</u>

**Cases**

*Aron v. United States*,
  291 F.3d 708, 714 n.5 (11th Cir. 2002)................................................... 12, 16, 30

*Friedman v. United States*,
  588 F.2d 1010 (5th Cir. 1979) ...................................................... 13, 17

*Gaines v. Hopper*,
  575 F.2d 1346, 1356 (5th Cir. 1978) ....................................................18

*Goodwin v. Balcom*,
  684 F.2d 794, 805 (11th Cir. 1982) ............................................. 13, 17

*Hill v. Lockhart*,
  474 U.S. 52, 58 (1985) ...........................................................30

*Holmes v. United States*,
  876 F.2d 1545, 1552 (11th Cir. 1989) ......................................... 13, 16

*House v. Balcom*,
  725 F.2d 608, 618 (11th Cir. 1984) .............................................. 13, 18

*Lafler v. Cooper*
  566 U.S. 156 (2012) ...........................................................30

*Missouri v. Frey*,
  566 U.S. 134 (2012) ...........................................................30

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) ...........................................................18

*Rummel v. Estelle*,
  590 F.2d 103, 104 (5th Cir. 1979) ....................................................18

*Strickland v. Washington*,
  466 U.S. 668, 687 (1984) .....................................................30

*United States v. Stein*,
  846 F.3d 1135, 1153 (11th Cir. 2017) ........................................................... 15, 32

*Von Molte v. Gilles*,
  332 U.S. 708, 721 (1948) ....................................................................................18

*Wiggins v. Smith*,
  539 U.S. 510, 521-22 (2003) ..............................................................................17

*Winthrop-Redin v. United States*,
  787 F.3d 1210, 1215 (11th Cir. 2014) ................................................................12

## Statutes

15 U.S.C. § § 78m(b)(5), 78m(b)(2) and 78ff(a) ......................................................3

18 U.S.C. § 1001 .......................................................................................................4

18 U.S.C. § 1343 .......................................................................................................3

18 U.S.C. § 1348 .......................................................................................................3

18 U.S.C. § 1349 .......................................................................................................3

18 U.S.C. § 371 ............................................................................................... 3, 4, 20

28 U.S.C. § 2255 .......................................................................................................5

28 U.S.C. § 2255(b)(1) ...................................................................................... 12, 16

## Other Authorities

17 C.F.R. 240.13b2-2 ...............................................................................................3

17 CFR. 240.13b2-1 ..................................................................................................3

U.S.S.G. 2B1.1 ........................................................................................................32

v

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231, because the defendant was charged with offenses against the laws of the United States.  The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which gives the courts of appeals jurisdiction over all final decisions of the district courts of the United States, and 18 U.S.C. § 3742(a), which authorizes the defendant's appeal of his sentence.

## STATEMENT OF THE ISSUES

### ISSUE I

WHETHER THE DISTRICT COURT ERRED IN DENYING, WITHOUT AN EVIDENTIARY HEARING, MR. DIMARIA'S CLAIM THAT COUNSEL WAS INEFFECTIVE FOR FAILING TO ADEQUATELY INVESTIGATE HIS CASE

### ISSUE II

WHETHER THE DISTRICT COURT ERRED IN DENYING WITHOUT AN EVIDENTIARY HEARING, MR. DIMARIA'S CLAIM THAT THE COUNSEL WAS INEFFECTIVE DURING THE PLEA NEGOTIATION STAGE BY FAILING TO ADVISE HIM ON HOW FINANCIAL LOSS IS CALCULATED

## STATEMENT OF THE CASE

Introduction

Historically, criminal actions based on earnings management (or as the government characterizes in this case, cookie jar accounting) have been the proverbial unicorn. Even on the rare occasion when prosecutions based on that theory have been pursued, the underlying facts are strikingly dissimilar to those in this case. Indeed, in those prosecutions the earnings management or cookie jar accounting resulted in the company consistently and repeatedly meeting or exceeding Wall St. quarterly performance/earnings expectations over an extended period of time; and the dollar amounts involved were concededly by any legal or accounting standard material in comparison to the company's quarterly earnings and overall financial picture. In striking contrast to those cases, in this case there was a documented lack of materiality, lack of criminality and lack of financial loss that but for trial counsel's inexcusable failure to investigate the case would have been discovered and made known to Mr. DiMaria. Had counsel not been ineffective and failed to investigate and properly advise Mr. DiMaria, he would not have pled guilty and instead would have insisted on exercising his constitutional right to trial by jury.

Course of Proceedings and Disposition in the District Court

On December 17, 2017, a grand jury sitting in the Southern District of Florida returned a 13-count indictment charging Mr. DiMaria, the former Chief Financial

Officer of Bankrate, a publicly traded company, with a variety of offenses arising out of his alleged utilization of a "cookie jar" or "cushion" accounting scheme to fraudulently manipulate the company's reported earnings during the last two quarters of 2011 and the first two quarters of 2012. [Cr.DE:1]. "Cookie jar" accounting is generally defined as intentionally shifting revenues or expenses out of the period in which they should be recognized, in order to preserve flexibility to meet or beat earning targets in upcoming quarters.

The initial indictment was superseded on May 15, 2018, when a grand jury returned a superseding indictment charging Mr. DiMaria with the following offenses arising out of the same "cookie jar" or "cushion" accounting practices:

> Count 1: Conspiracy to Make False Statements to a Public Company's Accountants and to Falsify Books, Records, and Accounts of a Public Company, in violation of 18 U.S.C. § 371;
>
> Counts 2-4: False Statements to Accountants, in violation of 17 C.F.R. 240.13b2-2 and 15 U.S.C. § 78ff(a);
>
> Counts 5-7: Making False Entries in a Public Company's Books, Records and Accounts, in violation of 17 CFR. 240.13b2-1 and 15 U.S.C. § § 78m(b)(5), 78m(b)(2) and 78ff(a);
>
> Count 8: Conspiracy to Commit Securities and Wire Fraud, in violation of 18 U.S.C. § 1349;
>
> Count 9: Wire Fraud, in violation of 18 U.S.C. § 1343; and
>
> Count 10: Securities Fraud, in violation of 18 U.S.C. § 1348.

[Cr.DE:58].

On June 28, 2018, Mr. DiMaria, pursuant to an agreement with the government, waived his right to be charged by indictment and pled guilty to a two-count superseding information charging him in Count 1 with Conspiracy to Make False Statements to a Public Company's Accountants and Falsify Public Company's Books and Records and to Commit Securities Fraud in violation of 18 U.S.C. § 371 and in Count 2 Making False Statements to the Securities and Exchange Commission in violation of 18 U. S.C. § 1001. [Cr.DE:64], [Cr.DE:68], [Cr.DE:73]. Each of the charges carried a statutory maximum penalty of imprisonment of 5 years.

Following the conclusion of Mr. DiMaria's sentencing hearing on September 26, 2018, the district court imposed consecutive statutory maximum penalties of imprisonment on each count, resulting in a total sentence of imprisonment of 10 years, and a three-year term of supervised release, and ordered restitution in the amount of $21,234,214.00. [Cr.DE:83].

Mr. DiMaria filed his 2255 petition on October 10, 2019, challenging his convictions and sentence for employing what the government characterized as a "cookie jar" accounting scheme (smoothing or managing of corporate earnings statements to meet or exceed Wall St. targets) and related conduct in the four fiscal quarters of the company's financial statements Q3 - 2011 to Q2 - 2012 following the company's June 2011 initial public offering in New York with Goldman Sachs as

lead underwriter. [DE:1]. The challenge was based on Mr. DiMaria's trial counsel's constitutionally deficient representation throughout the case.

The government filed its response to Mr. DiMaria's petition on October 25, 2019, [DE:5], urging primarily that the petition should be denied based on the acknowledgments Mr. DiMaria had made in his signed, written plea agreement, factual proffer, plea colloquy and his brief allocution given during his sentencing hearing. Essentially, the government argued that those factors coupled with the magistrate judge's plea colloquy adhering to the basic requirements of Fed. R. Crim. P. 11 excused counsel's constitutionally deficient advice and performance. Mr. DiMaria filed his reply to the government's response on November 22, 2019. [DE:9].

On September 13, 2021, the magistrate judge to whom the petition had been referred entered her Report and Recommendation on Edward J. DiMaria's Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255. [DE:11]. The R&R recommended that the claims for relief and request for an evidentiary hearing be denied based, *inter alia*, on a *sua sponte* finding that the allegations in the petition were conclusory and lacking foundation. Mr. DiMaria timely filed objections to the R&R, preserving his arguments that his petition should not have been denied given that the record did not refute his claims and because disputed questions of fact required an evidentiary hearing. [DE:15].

5

On March 3, 2022, the district court entered its Order on Report and Recommendation adopting the R&R, overruling Mr. DiMaria's objections to the R&R, denying all claims for relief raised in the § 2255, and ordering that no certificate of appealability shall issue. [DE:18].

On August 17, 2022, Mr. DiMaria filed a Motion for Certificate of Appealability to appeal the district court's denial of his 2255 motion and raising the following grounds for relief: (1) trial counsel failed to conduct adequate factual and legal research, leading counsel to provide erroneous advice about the essential elements of the offense, as well as his procedural rights and available defenses; (2) the district court violated his due process rights by allowing him to enter an involuntary, unknowing, and unintelligent guilty plea, when he did not understand the facts and law relevant to his case, and where he was actually innocent; and (3) counsel failed to contest the sentencing enhancements for loss amount and the number of victims. With regard to all his claims, he also requested an evidentiary hearing.

On February 27, 2023, this Court entered an Order granting a Certificate of Appealability on the following issues:

(1)    Whether the district court erred in denying, without an evidentiary hearing, Mr. DiMaria's claim that counsel was ineffective for failing to adequately investigate his case?

(2)     Whether the district court erred in denying, without an evidentiary hearing, Mr. DiMaria's claim that the counsel was ineffective during the plea negotiation stage by failing to advise him on how financial loss is calculated?

## STATEMENT OF THE FACTS

### A. The Underlying Investigation

The investigation that culminated in the criminal prosecution of Mr. DiMaria was launched by the Securities and Exchange Commission (SEC) in the third Quarter of 2012 following the agency's receipt of a "whistleblower" complaint alleging certain accounting irregularities. The scope of the SEC investigation was wide ranging. When Bankrate learned of the investigation, the company's board of directors ordered that an internal investigation be conducted by outside counsel, Wachtel Lipton and the company's external auditors, Grant Thornton. At the point in time when Bankrate learned of the SEC investigation, the company was particularly incentivized to conduct a comprehensive and thorough investigation. Bankrate was in the midst of planning a secondary public offering of its stock, as well as a bond offering. Bankrate's Board of Directors therefore required and demanded a thorough investigation that would ferret out any information concerning material accounting irregularities. If these alleged irregularities were deemed

7

material and not included in the SEC filings that would be made in connection with the upcoming offerings, it could create tremendous exposure for the company. [DE:1].

The Grant Thornton audit team staffed by numerous accountants, including forensic accountants, ultimately concluded that none of the questioned accounting entries, either individually or in the aggregate, were materially inaccurate, and that no fraud or criminal activity had occurred. [DE:1]. As part of its forensic audit, the Grant Thornton team had access to and reviewed what ultimately became the government's cornerstone, or showpiece of this case—the so-called "cushion" or "cookie jar" spreadsheet. The auditors were well aware of the alleged excess reserves, yet they declined to make or recommend any changes to the financial statements because the reserves were not considered to be materially inaccurate. Outside counsel, Wachtel Lipton, independently came to the same conclusion. [DE:1].

In summary, following the completion of their respective investigations, Grant Thornton, and Wachtel Lipton concluded that (1) no changes to the company's financial statements were necessary, given that they were fairly stated in accordance with generally accepted accounting principles (GAAP); and (2) there was no fraud. [DE:1].

The conclusions reached by Grant Thornton, and Wachtel Lipton were shared with the SEC as well as the company's Board of Directors, audit committee, majority shareholder, and investment banker. The company's financial statements for the quarters in question remained unchanged and were included in the registration statements filed in 2013 and 2014 in connection with the secondary public stock and bond offerings, with the blessing and approval of Bankrate's accountants and attorneys. [DE:1].

## B. Mr. DiMaria's Tenure at Bankrate

Mr. DiMaria served as the chief financial officer of Bankrate from 2006 until September 2014. Bankrate operated as a marketing and financial publishing company aggregating and disseminating information and data related to various consumer financial products, including mortgages, credit cards, insurance, and automobile loans. [DE:1].

During Mr. DiMaria's tenure as chief financial officer, Bankrate enjoyed unprecedented growth and success. When he joined Bankrate, it was a small public company valued at approximately $600 million. Three years later, the company was acquired by Apax Partners, a private entity, in a deal valued at approximately $571 million. [DE:1].

Between 2009 and mid-2011, Bankrate's, business greatly expanded through a series of acquisitions. In June 2011, the company went public again, and its stock

9

was trading with a market capitalization of $1.4 billion. Despite the September 2014 announcement to the public that the SEC was investigating the company's accounting practices and the subsequent release of restated financials in 2015, Bankrate actually grew its market cap. In mid-2017, a private company, Red Ventures, purchased Bankrate in a go private transaction deal approximately $1.7 billion. [DE:1].

## C. <u>The Government's Theory of the Case</u>

In its response to Mr. DiMaria's petition, the government summarized its theory of the case as follows:

> From in or around September 2006 to September 2014, Movant served as the Chief Financial Officer ("CFO") of Bankrate, a marketing and financial publishing company. (DE:64 at ¶ 6). Bankrate became a publicly traded company and registered with the SEC in or around June 2011. (*Id*. at ¶ 5). As CFO, Movant was responsible for maintaining Bankrate's books and records, and for certifying the accuracy of Bankrate's financial statements to the SEC. (*Id*. at ¶ 6).

> In 2011, Bankrate reported that it earned about $424 million in total revenue, which increased to $457 million in 2012. [DE:80 at 4]. The evidence shows that Movant engaged in a cookie jar accounting scheme to keep unsupported accruals on Bankrate's balance sheet in order to selectively reverse them in future quarters and falsely inflate Bankrate's publicly-reported earnings and adjusted earnings. [DE:64 at Count 1, ¶ 5]. Movant and his co-conspirators created a document,

entitled "cushion," to track the unsupported and improperly recorded accruals. (*Id*.) Under Movant's direction, Bankrate's finance department also booked routine fees and expenses as "deal related expenses" or "deal costs," further excluding expenses from their publicly reported adjusted earnings figures and artificially inflating Adjusted Earnings Per Share ("EPS") and Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") figures that were disclosed to investors. (*Id*. at Count 1, ¶ 6). These inappropriate entries were also tracked on the "cushion" spreadsheet maintained by Movant's co-conspirators at his direction.

Movant and his co-conspirators concealed certain of these false and misleading entries from Bankrate's independent accounting firm. (*Id*. at Count 1, ¶ 7). Moreover, between June 2011 and September 2014, Movant signed letters to Bankrate's auditors, falsely certifying that he (1) had made available to Bankrate's auditors all financial records and related data of Bankrate; (2) had no knowledge of fraud or suspected fraud affecting Bankrate involving Bankrate's management; and (3) was not aware of any information indicating that an illegal act may have occurred. (*Id*.).

Finally, Movant filed false financial statements with the SEC, containing material misrepresentations about Bankrate's financial status. (*Id*. at Count 1, ¶ 8). By selectively reversing only particular expense accruals from the "cushion," Movant inflated Bankrate's reported financial metrics and caused Bankrate to file false earnings figures for the quarter ending on March 31, 2012. (*Id*.).

[DE:5 at 2-3].

11

## STANDARD OF REVIEW

This Court reviews the district court's denial of an evidentiary hearing in a §

2255 proceeding for abuse of discretion. *See Aron v. United States*, 291 F.3d 708,

714 n.5 (11th Cir. 2002). *Winthrop-Redin v. United States*, 787 F.3d 1210, 1215 (11th

Cir. 2014).

## SUMMARY OF THE ARGUMENT

This Court granted Mr. DiMaria a certificate of appealability, with regard to

two issues: (1) whether the district court erred in denying, without an evidentiary

hearing, Mr. DiMaria's claim that counsel was ineffective for failing to adequately

investigate his case, and (2) whether the district court erred in denying without an

evidentiary hearing, Mr. DiMaria's claim that the counsel was ineffective during the

plea negotiation stage by failing to advise him on how financial loss is calculated.

As to both issues, the district court erred in denying his claims without holding

an evidentiary hearing. 28 U.S.C. § 2255(b)(1) provides in pertinent part:

> Unless the motion and the files and records of the case conclusively
> show that the prisoner is entitled to no relief, the court shall cause notice
> thereof to be served upon the United States attorney, grant a prompt
> hearing thereon, determine the issues and make findings of fact and
> conclusions of law with respect there to..

This Court has construed § 2255(b)(1) as entitling a petitioner to an

evidentiary hearing if he "alleges facts that if true would entitle him to relief." *United*

*States v. Aron*, 291 F.3d at 215 (quoting *Holmes v. United States*, 876 F.2d 1545,

1552 (11th Cir. 1989)). The petitioner has no other burden of proof at this stage. *Aron* at 715 n.6 ("[A] petitioner need only allege—not prove—reasonably specific, non-conclusory facts that if true would entitle him to relief."). Moreover, it is clear that affidavits alone (and most certainly unsworn allegations, speculative assertions and arguments in the government's response to a § 2255 petition) cannot resolve contested issues of fact in § 2255 cases. *See, e.g.*, *Friedman v. United States*, 588 F.2d 1010, 1015 (5th Cir. 1979).

Here, Mr. DiMaria has clearly made the requisite showings with regard to each of the issues raised, and the district court erroneously denied him his right to an evidentiary hearing.

To begin with, to assure that the accused is afforded his Sixth Amendment right to effective assistance of counsel, the law requires counsel in a criminal case to perform an adequate pretrial investigation. *See, e.g.*, *Goodwin v. Balcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("At the heart of effective representation is the independent duty to investigate and prepare); *House v. Balcom*, 725 F.2d 608, 618 (11th Cir. 1984) ("The admitted failure to investigate facts is unconscionable and falls below the level of performance required of counsel by the sixth amendment.").

In his § 2255 petition, Mr. DiMaria alleged in detail trial counsel's failures to properly investigate the case. In summary, trial counsel had access to two reports that demonstrated (1) none of the alleged accounting irregularities the government

relied on to establish criminal liability were material; and (2) no fraud had been committed.

Trial counsel either ignored the contents of the reports, disregarded the reports, or failed to understand that the reports' findings completely undermined the government's theory of the case and, further, demonstrated that the government could not prove beyond a reasonable doubt the element of materiality that was part of each of the offenses charged in the Superseding Indictment. Moreover, had counsel properly conducted additional investigation based on the reports' findings, he would have discovered a significant amount of additional information negating any alleged criminality on the part of Mr. DiMaria.

Finally, Mr. DiMaria alleged that but for trial counsel's inexplicable failure to investigate and the constitutionally deficient advice he received arising from those failures, he would not have pled guilty but, instead, would have gone to trial.

Mr. DiMaria is likewise entitled to an evidentiary hearing on his claim that trial counsel was ineffective during the plea negotiation stage by failing to advise him how financial loss is calculated.

In his § 2225 Petition, Mr. DiMaria specifically alleged that trial counsel was ineffective due to his failure to challenge the government's $25 million loss calculation, to provide Mr. DiMaria with an adequate explanation as to how that figure was calculated, and in advising him to blindly accept the government's loss

calculation, plead guilty and proceed to sentencing. In his pleadings, Mr. DiMaria explained that counsel's ineffectiveness arose, *inter alia*, due to his inexplicable ineptitude in ignoring or failing to comprehend this Court's decision in *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017), effectively disapproving the government's loss theory employed in Mr. DiMaria's case; in failing to utilize or comprehend an expert report debunking the government's loss calculations; and that there was no rational or strategic reason excusing his failures.  Mr. DiMaria added that, once again, he was prejudiced by trial counsel's ineffectiveness. He surrendered his right to trial, pled guilty and was ultimately sentenced to a decade in prison based on inflated, unchallenged, and legally incorrect guideline loss figures. Had counsel not been ineffective and instead fulfilled his constitutional duty to explain the government's loss calculation theory to Mr. DiMaria, Mr. DiMaria would not have pled guilty, but rather, would have exercised his right to trial.

## ARGUMENT AND CITATIONS OF AUTHORITY

### ISSUE I

**WHETHER THE DISTRICT COURT ERRED IN DENYING, WITHOUT AN EVIDENTIARY HEARING, MR. DIMARIA'S CLAIM THAT COUNSEL WAS INEFFECTIVE FOR FAILING TO ADEQUATELY INVESTIGATE HIS CASE.**

### A.
### Entitlement to an Evidentiary Hearing in a § 2255 Proceeding

1.    *The Statutory Command*

28 U.S.C.§ 2255(b)(1) dictates the parameters of the district court's inquiry in determining whether to grant an evidentiary hearing and provides:

> Unless the motion and the files and records of the case   conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

2.    *The Case Law*

In light of the clear dictates of § 2255(b)(1), this Circuit has determined that a petitioner is entitled to an evidentiary hearing if he "alleges facts that, if true, would entitle him to relief." *United States v. Aron*, 291 F.3d at 215 (quoting *Holmes v. United States*, 876 F.2d 1545, 1552 (11th Cir. 1989)). The petitioner has no other burden of proof at this stage. *Aron* at 715 n.6 ("[A] petitioner need only allege—not

16

prove—reasonably specific, non-conclusory facts that if true would entitle him to relief."). Moreover, it is clear that affidavits alone (and most certainly unsworn allegations, speculative assertions and arguments in the government's response to a § 2255 petition) cannot resolve contested issues of fact in § 2255 cases. *See, e.g.*, *Friedman v. United States*, 588 F.2d 1010, 1015 (5th Cir. 1979).

## B.
### Counsel's Obligation to Conduct an Adequate Investigation

To assure an accused is afforded the Sixth Amendment right to effective assistance of counsel, the United States Supreme Court, this Court and published prevailing professional standards require counsel in a criminal case to perform an adequate pretrial investigation.

In *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003), the Court confirmed that counsel has a duty to undertake a reasonable investigation (or make a reasonable decision that makes particular investigation unnecessary.

This Circuit likewise recognizes the obligation of counsel to perform an adequate pretrial investigation. Indeed, the duty to investigate is the foundation of the Sixth Amendment right to effective assistance of counsel. *See, e.g.*, *Goodwin v. Balcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("At the heart of effective representation, is the independent duty to investigate and prepare."). "[C]ounsel have a duty to interview potential witnesses and make an independent examination of the facts,

circumstances, pleadings, and laws involved." *Rummel v. Estelle*, 590 F.2d 103, 104 (5th Cir. 1979) (quoting *Von Molte v. Gilles*, 332 U.S. 708, 721 (1948)). "[T]he cornerstones of effective assistance of counsel" are the "[i]nformed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case." *Gaines v. Hopper*, 575 F.2d 1346, 1356 (5th Cir. 1978); "The admitted failure to investigate facts is unconscionable and falls below the level of performance required of counsel by the sixth amendment." *House v. Balcom*, 725 F.2d at 618.

Prevailing professional norms likewise impose an obligation on defense counsel to undertake an adequate investigation.[1] ABA Standard 4-4.1 Duty to Investigate and Engage Investigators provides:

> (a) Defense counsel has a duty to investigate in all cases, and to determine whether there is a sufficient factual basis for criminal charges.
>
> (b) The duty to investigate is not terminated by factors such as the apparent force of the prosecution's evidence, a client's alleged admissions to others of facts suggesting guilt, a client's expressed desire to plead guilty or that there should be no investigation, or statements to defense counsel supporting guilt.

---

[1] The Supreme Court has routinely acknowledged that prevailing professional norms of practice, as reflected in American Bar Association standards, are guides to determining the reasonable scope of an attorney's obligations to his client. *See, e.g., Padilla v. Kentucky*, 559 U.S. 356, 367 (2010).

18

(c) Defense counsel's investigative efforts should commence promptly and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter, consequences of the criminal proceedings, and potential dispositions and penalties. Although investigation will vary depending on the circumstances, it should always be shaped by what is in the client's best interests, after consultation with the client. Defense counsel's investigation of the merits of the criminal charges should include efforts to secure relevant information in the possession of the prosecution, law enforcement authorities, and others, as well as independent investigation. Counsel's investigation should also include evaluation of the prosecution's evidence (including possible re-testing or re-evaluation of physical, forensic, and expert evidence) and consideration of inconsistencies, potential avenues of impeachment of prosecution witnesses, and other possible suspects and alternative theories that the evidence may raise.

(d) Defense counsel should determine whether the client's interests would be served by engaging fact investigators, forensic, accounting or other experts, or other professional witnesses such as sentencing specialists or social workers, and if so, consider, in consultation with the client, whether to engage them. Counsel should regularly re-evaluate the need for such services throughout the representation.

## C.

**Mr. DiMaria is Entitled to an Evidentiary Hearing Regarding his Claims of Counsel's Failure to Investigate.**

Each of the charges brought against Mr. DiMaria in the Superseding Indictment [CrDE:58] required proof beyond a reasonable doubt of the critical

19

element of materiality.  *See*, *e.g.*, [CrDE:58] (Count 1: Conspiracy to Make False Statements to a Public Company's Accountants and to Falsify Books, Records, and Accounts of a Public Company in violation of 18 U.S.C. § 371, 15 U.S.C. § 78ff, 15 U.S.C. § 78m(b)(2), § 78m(b)(5) alleging Edward DiMaria did willfully and knowingly conspire to knowingly and willfully, directly and indirectly make, and causes to be made <u>materially false, and misleading statements</u> to Accounting Firm A, and omit to state, and cause another person to omit to state, any <u>material fact</u>, to Accounting Firm and take action to coerce, manipulate, mislead, influence, Accounting Firm A, knowing that such action, if successful could result in rendering Bankrate's, financial statements, materially misleading; Counts 2-4: False Statements to Accountants, in violation of § 78ff(a), etc., alleging Mr. DiMaria made, or caused to be made <u>materially false statements</u> to Accounting Firm A etc.; Counts 5-7: False Entries in a Public Company's Books, Records and Accounts, in violation of 15 U.S.C. § 78m(b)(5), 15 U.S.C. § 78m(b)(2) and § 78ff(a), alleging knowing and willful falsification of books, records, and accounts required to in reasonable detail, accurately and fairly reflect certain transactions;[2] Counts 8, 9 and 10 Conspiracy to Commit Securities and Wire Fraud  and substantive Wire Fraud and Securities Fraud in violation of 18 U.S.C. § 1349, § 1343 and § 1348  alleging

---

[2] The language regarding "accounts required in reasonable detail to accurately and fairly reflect language" is applied as an equivalent of the materiality requirement.

utilization of <u>materially false and fraudulent pretenses representations, and promises</u>.).

Based not only on the specific allegations of the Superseding Indictment but also on the well-established body of case law holding that where materiality is an essential element of the offense it must be alleged and proved beyond a reasonable doubt, any reasonably competent counsel should have able to readily discern that to secure a conviction on any count, the government would have to prove the materiality of the alleged false statements beyond a reasonable doubt. Moreover, any reasonably competent counsel should have been able to determine that the government faced a nearly insurmountable task in proving materiality beyond a reasonable doubt under the facts of this case. Simply put, Accounting Firm A, which is Grant Thornton, had, as described above, conducted its own independent investigation and audit, concluding that there were no material accounting errors, and that there was no fraud. A second inquiry conducted by Wachtel Lipton reached the same conclusions. That information was readily available and was known or should have been known to counsel at least by the time charges were formally filed against Mr. DiMaria in December 2017. All of this available information was ignored by or escaped the grasp of Mr. DiMaria's counsel.

Despite having the Grant Thornton and Wachtel Lipton reports (as well as three other reports debunking the government's theory of criminal liability and a

fourth report torpedoing its loss analysis), counsel, for no justifiable reason, ignored the reports, performed no additional investigation, erroneously decided materiality was either not an element of the offense (or in any event just didn't matter) and then advised Mr. DiMaria of his unsupported, patently erroneous conclusions.

Mr. DiMaria alleged in his Petition that his trial counsel affirmatively misadvised him regarding the relevant elements of the offense (including materiality), procedural rights, and available defenses (including lack of materiality of the alleged false statements). He went on to explain that counsel inexcusably failed to perform and/or complete an adequate investigation that would have established that he was, and is actually innocent of the offenses charged in the Superseding Indictment, as well as the two-count Information to which he ultimately pled guilty. [DE:1]. In that regard, he further alleged that the Grant Thornton audit team concluded that none of the questioned accounting entries, either individually, or in the aggregate, were materially inaccurate and that no fraud, or criminal activity had occurred; that the cushion spreadsheet that became the cornerstone of the prosecution was reviewed by the auditors and their findings were shared with the SEC; that the auditors were well aware of the so-called excess reserves and declined to make or recommend any change to the financial statements, because the reserves were not considered to be materially inaccurate; that Wachtel, Lipton, based on its own independent investigation, reached the same conclusion. [DE:1].

Mr. DiMaria also alleged that by the time he was initially indicted in December 2017, his counsel was or should have been aware of the conclusions reached by Grant Thorton and Wachtel Lipton; and that there were four other reports, prepared by potential expert witnesses, three of which established that Mr. DiMaria had not engaged in criminal or fraudulent conduct, and the fourth of which concluded that the government loss amount calculations were flawed and grossly exaggerated. [DE:1].

Mr. DiMaria then explained in detail that had counsel understood and properly utilized the Grant Thornton, Wachtel Lipton and other reports, additional investigation would have revealed:

- The rapid growth of Bankrate, through numerous acquisitions, an initial public offering, a secondary public offering, and a substantial bond offering, created an extraordinarily complex accounting scenario involving numerous general ledger systems. Consequently, movant was placed in a position where he had to make good faith discretionary estimates and decisions on how to book revenue and expense estimates. Ultimately, all entries directed or approved by movant were shown to be either justified, simple judgmental errors and in any event, simply not material using traditional accounting metrics.

23

- The amounts on the so-called cushion spread sheet are not material. And the government's theory that excess expense reserves were accumulated (on the spread sheet) in good quarters so they could be reversed in bad quarters to artificially increase EBITDA (earnings before interest, taxes, depreciation, and amortization) is factually baseless given that there is no meaningful quarterly fluctuation reflected on the sheet.

- The government's theory of the case ignores the fact that the majority of the potential cushion reserves are tied to acquisitions and legitimate deal cost accruals that are separately tracked and do not impact EBITDA. Adjustments to acquisition reserves were appropriate and do not affect the EBITDA or the financial condition of Bankrate.

- Movant's interim disclosures to the auditors regarding the Management Incentive Program which were made on a total company wide basis were sufficient and complete given the expected year end changes that would have to be made when the program was fully implemented and more complete performance data concerning the separate mortgage, credit card and insurance divisions was available.

- The government's allegations concerning the alleged impropriety of movant's sale of a portion of his Bankrate stock in August 2012 are baseless. The trades occurred during an approved open window trading period, and were not based

on inside information that Bankrate would underperform in the quarter or that he traded while engaged in accounting fraud that had materially inflated the company's financials. Quite simply, there was no accounting fraud and the later third quarter dip in the price of Bankrate's stock was the result of issues that had not yet arisen or were not known or envisioned at the time of the trades. There was no criminality in any aspect of movant's stock sales.

- The government characterized simple errors made by staff accountants as criminal where the error supported their narrative that operating expenses were inappropriately recorded as accrued deal costs. At the same time, the government ignored an error by the same accountant in an earlier quarter where he incorrectly overstated operating expenses that reduced EBITDA – the reason being it did not fit the government's narrative. The government likewise ignored several of the movant's accounting decisions for the same reason.

- For a number of reasons, any misstatements or omissions in representation letters sent to the auditors were simply not material. In any event, the auditors already had access to all relevant material matters purportedly not included in the letters.

- Any alleged false accounting entries were simply nonmaterial technical infractions that fell well below generally accepted accounting materiality

thresholds. Moreover, these entries did not change the overall financial picture of Bankrate.

- Movant hired personnel and implemented programs to improve the accuracy of Bankrate's accounting systems.

- Approximately 97% of CFOs use "non-GAAP metrics" in making accounting decisions. This directly contradicts the government's position that accounting decisions must be irrevocably tethered to GAAP. In fact, non-GAAP measures are widely used and by definition require the exercise of management judgment and discretion and the use of estimates and projections based on existing data and/or data trends.[3]

Finally, Mr. DiMaria alleged that but for counsel's ineffective assistance, he would not have waived indictment, would not have pled guilty, and would have insisted on going to trial. [DE:1].

In its response, the government never factually contradicted Mr. DiMaria's sworn allegations that counsel had failed to conduct an adequate investigation. Rather, instead of pointing to even a scintilla of evidence contradicting the allegations, the government proffered an opinion that his counsel were highly skilled white-collar, criminal defense attorneys, who secured him a substantial bargain. [DE:5].

---

[3] The Grant Thornton report is attached to Mr. DiMaria's Objections to the Report and Recommendation as Appendix A; the Wachtel Lipton report is attached as Appendix B. [DE:15].

Moreover, the government never even attempted to offer a reasonable explanation or hypothesis as to why counsel failed to consider and utilize the Grant Thornton, Wachtel Lipton, and other reports decimating the underlying theory of its case. Instead, the government rehashed its now disproved theory that a cookie jar accounting fraud scheme occurred at Bankrate. [DE:5]. However, government's own table analyzing Bankrate's performance during the quarters in question in fact demonstrates the exact opposite of what a cookie jar accounting scheme is designed to accomplish (and highlights what competent counsel should have determined from the outset of the case):

| Quarter / Metric | Analyst Consensus | Bankrate Actual |
|---|---|---|
| *Q3 2011* | | |
| Adjusted EPS | 0.138 | 0.18 |
| Adjusted EBITDA | | $36.0 million |
| Revenue | $99.9 million | $112.9 million |
| *Q4 2011* | | |
| Adjusted EPS | 0.152 | 0.19 |
| Adjusted EBITDA | $34.0 million | $38.5 million |
| Revenue | $104.3 million | $113.8 million |
| *Q1 2012* | | |
| Adjusted EPS | 0.194 | 0.18 |
| Adjusted EBITDA | $39.8 million | $37.8 million |
| Revenue | $126.8 million | $125.0 million |
| *Q2 2012* | | |
| Adjusted EPS | 0.174 | 0.18 |

| Adjusted EBITDA | $37.2 million | $37.5 million |
|---|---|---|
| Revenue | $123.6 million | $122.1 million |

Available data confirms that in both the third and fourth quarters of 2011 Bankrate substantially outperformed the analysts' projections with regard to adjusted earnings per share, "EPS", adjusted earnings before interest, taxes, depreciation, and amortization "EBITDA" and revenue. Despite Bankrate exceeding analyst expectations in a variety of accounting metrics (for example, Bankrate exceeded adjusted EBITDA for Q4 by 4.5 million), there were no corresponding cookie jar expense accruals made to "lower" these results to "save" them for future quarters. Immediately following Q4 2011, for example, Q1 2012, the quarter with which the government charged Mr. Dimaria with making false entries, Bankrate failed to meet analyst expectations with regard to EPS, EBIDTA and revenue. Yet, there are no material expense reversals that were utilized in an effort to meet or come closer to the analysts' expectations. The quarter was missed by 2 million and yet Mr. DiMaria did not engage in the practice the government accused him of, despite having a perfect opportunity to do what a cookie jar scheme would entail given the results of Q3 and Q4 2011. The first quarter of 2012 was still a substantial miss and there never were any cookie jar funds reserved or made available to make the quarter.

Mr. Dimaria has clearly and plainly alleged that had his counsel properly investigated the case and used and built upon the information included within the

Grant Thornton and Wachtel Lipton reports and other reports, he would have recognized the government's case for precisely what it is—nothing more than a factually and legally unjustifiable effort to criminalize non-material accounting adjustments that neither hid nor distorted the true financial condition of the company in an effort to meet or exceed Wall Street analyst expectations, or for Mr. DiMaria to unjustly enrich himself.

Mr. DiMaria has alleged facts that if true would entitle him to relief. The sworn assertions in his petition show that his counsel's failure to investigate (including the failure to understand, utilize and further develop the findings of the Grant Thornton and Wachtel Lipton reports) resulted in counsel misadvising him concerning *inter alia*, the critical element of materiality. And there is no reasonable explanation or strategic reason justifying the failures. The failure to investigate, together with counsel's other lapses (especially under the circumstances of this case) and the resulting misadvice to Mr. DiMaria fall fathoms below the prevailing professional standards governing counsel's obligations. Moreover, Mr. DiMaria suffered prejudice as a result of counsel's constitutionally deficient performance: but for counsel's ineffectiveness, he would not have pled guilty and instead he woud

have insisted on exercising his constitutional right to trial by jury.  He is now entitled to an evidentiary hearing. *See United States v. Aron*, 291 F.3d at 215.[4]

## ISSUE II

**WHETHER THE DISTRICT COURT ERRED IN DENYING, WITHOUT AN EVIDENTIARY HEARING, MR. DIMARIA'S CLAIM THAT COUNSEL WAS INEFFECTIVE DURING THE PLEA NEGOTIATION STAGE BY FAILING TO ADVISE HIM ON HOW FINANCIAL LOSS IS CALCULATED.**

It is well settled that the accused has the right to the effective assistance of counsel during the plea negotiation stage of his case. *Missouri v. Frey*, 566 U.S. 134 (2012), *Lafler v. Cooper*, 566 U.S. 156 (2012). In his § 2255 Petition, Mr. DiMaria alleged that counsel was ineffective for a number of reasons, including his abject failure to challenge the government's loss calculation and to offer an adequate explanation to him as to how that loss figure was calculated.  "If the movant had been properly advised as to the unfounded premise for the waivers in the plea agreement-including the significant over statement of any loss amount and related victim enhancement – the Movant would have proceeded to trial rather than accept such terms" [DE:1].

---

[4] To establish ineffective assistance of counsel, movant must show that counsel's performance was deficient, and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Prejudice exists when but for counsel's errors movant would not have pled guilty, but would have gone to trial.  *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

For its part, the government in its response [DE:5] failed to provide any explanation, let alone a cogent explanation, as to the factual and legal basis used to calculate the approximate $25 million loss figure. In fact, the government's simplistic loss formulation is at odds with the methodology recognized by this Court in *United States v Stein*, 846 F.3d 1135 (11th Cir. 2017).

The theory articulated by the government was that loss was calculated solely as to the amount of Bankrate's stock price drop multiplied by the number of outstanding shares on the date that the SEC inquiry into the company's financial statements was made public, and on the date that Bankrate restated its financials. [Cr.DE:73 at 45-46] (prosecutor states that the government  "identified specific accounts who held Bankrate stock on two different dates, when first Bankrate publicly reported for the first time in September 2014, that Bankrate's financial statements could no longer be relied on, shareholders in Bankrate stock at that time suffered a loss due to the decline in Bankrate stock" and at a later period of time, "[when] Bankrate then, in fact, did restate its financial statements, and at that time Bankrate stock again suffered a loss due to the public announcement of the restated financial statements.").  The government's theory is seriously flawed, and counsel was ineffective in recognizing that, ineffective in failing to advise Mr. DiMaria that the government's loss calculations were flawed and ineffective in advising him to

blindly accept the government's loss calculation, plead guilty, and proceed to sentencing.

In advising Mr. DiMaria to accept the government's grossly exaggerated unsupported loss calculation, counsel ignored or failed to comprehend the fundamental requirement of proximate causation of investor purchases due to the alleged fraudulent misstatements. In a securities fraud case, such as the present case, this Court has made it clear that inflating investor losses based simply on stock price variation is fundamentally erroneous. "[T]he government must show that the investors relied on the fraudulent information to satisfy the 'but for' causation requirement under U.S.S.G. 2B1.1." *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017).

*Stein* was decided over a year before Mr. DiMaria pled guilty in this case. Counsel's inexplicable ineptitude in failing to understand and address the complete failure and inability of the government to even attempt to make a factual showing— or for the government to even claim that it intended to meet the *Stein* requirement— demonstrates that counsel fell well short of professional norms.[5]

---

[5] The government's theory is also flawed for the reason that it fails to consider that there was additional information in the 2014 announcement and 2015 restated financials unrelated to Mr. DiMaria's alleged criminal conduct that well may have independently impacted Bankrate's stock price.  Counsel also failed to identify this additional error impacting the loss calculation.

Counsel's failure to explain to Mr. DiMaria the government's flawed loss calculation theory engendered the erroneous belief that there was a basis for the purported $25 million loss when, in fact, no such legal or factual basis existed. Counsel's failure cannot be justified as a strategic decision. Rather, if anything, it was a decision based on a lack of understanding of the facts of the case and controlling decisional authority. But for counsel's ineffectiveness, Mr. DiMaria would not have pled guilty and accepted the loss amount. Instead, he would have gone to trial.

Mr. DiMaria has demonstrated his entitlement to an evidentiary hearing. He has once again alleged facts that if true would entitle him to relief. He has shown that counsel was clearly ineffective in blindly accepting the government's loss theory and figures that had no factual or legal basis and were contrary to this Court's decision in *Stein*, and in failing to advise and explain to Mr. DiMaria how the loss was calculated. There is no reasonable or strategic reason excusing counsel's failures. Once again, Mr. DiMaria was prejudiced by counsel's failure. He lost his right to go to trial and was ultimately sentenced to a decade in prison based on inflated, unchallenged and legally incorrect guideline loss figures. He should now be afforded the right to prove his claims at an evidentiary hearing.

## **CONCLUSION**

Based on the foregoing arguments and citations of authority this Court should reverse the district court's summary denial of Mr. DiMaria's § 2255 Petition and remand this case for an evidentiary hearing on both of the issue raised herein.

Respectfully submitted,

 s/ Richard C. Klugh
Richard C. Klugh, Esq.
Attorney for Appellant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Telephone No. (305) 536-1191
Facsimile No. (305) 536-2170

**CERTIFICATE OF COMPLIANCE**

I CERTIFY that this Brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7).  According to the Word program on which it is written, the numbered pages of this Brief contain 7,122 words.  This document complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared using Word in a proportionally spaced typeface with Times New Roman  14-point font.


                                                                 s/ Richard C. Klugh
                                                                Richard C. Klugh, Esq.




**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that this brief has been electronically filed via the CM/ECF Portal and served on all interested parties on this <u>10th</u> day of August 2023.


                                                        By: <u>s/ Richard C. Klugh</u>
                                                                Richard C. Klugh