No. 22-11470-A

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————————

## EDWARD J. DIMARIA,

### Petitioner-Appellant,

### v.

## UNITED STATES OF AMERICA,

### Respondent-Appellee.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
NO. 1:19-CV-24195 (HON. K. MICHAEL MOORE)

————————————

## ANSWERING BRIEF FOR THE UNITED STATES

————————————

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In addition to the persons identified in the certificate of interested persons filed by the United States in this Court on June 1, 2022, the following persons may have an interest in the outcome of this case:

Argentieri, Nicole M.

Laing, Andrew W.

In compliance with Fed. R. App. P. 26.1(b), the following entities are the organizational victims in this case:

A4IXT Average Price Account

Absolute Return Capital, LLC

Alliance Capital Management

Alpine Global Management, LLC

ANS Agency Suspense

Archipelago, LLC

Archipelago Securities, LLC

ASA Investments, LP

ATM Execution, LLC

ATS_ERR - Inventory

Automated Trading Desk Financial Services, LLC

Avatar Securities, LLC

Aver. PX

The Bank of New York Mellon

Barclays Capital

Bats Trading, Inc.

Blackrock Financial Management

Bloomberg

Capital Markets, LLC

Cheevers & Company, Inc.

CIF Emerging Growth

Citadel Advisors, LLC

Citadel Investments

Citadel Derivatives Group, LLC

Citigroup Global Markets Europe, Ltd.

Clinton Group, Inc.

Cognitive Capital, LLC

Cowen Cap LLC

Creation Redemption Account

CS SEC USA, LLC

Customer Programs

CX Agency Cross

Dax Partners LP

DE Shaw & Co.

Direct Edge ECN LLC

Dow Chemical Opp Growth

EBX, LLC

ECED EC J.P. Morgan Securities, LLC

Ellington Management Group, LLC

Ellington MGMT Group, LLC

E*trade Capital Markets

Fidelity Management & Research Company

First Clearing, LLC

FIS Global Execution Services Limited

Fox River Execution Technology, LLC

GETCO Execution Services, LLC

Goldman Sachs

Hamilton College

ICS Opp, Ltd

Instinet, LLC

Instinet-Top

Integrated Assets, LLC

Integrated Core Strategies, LLC

Intersystem

Investment Technology Group, Inc.

ITT Hartford

Jefferies Execution Services, Inc.

Jefferies, LLC

JP Morgan Securities LLC

Knight Capital Americas, LLC

Knight Capital Markets

Knight Direct

Lampost Capital, LC

Lex Group, Inc.

Lightspeed Trading, LLC

Liquidnet Holdings, Inc.

Lung Associates, PC

Merrill Lynch

MetLife

Millennium Management, LLC

Millennium Partners, LP

Morgan Stanley & Co. LLC

Nasdaq Execution Services, LLC

National Financial Services, Corp.

National Financial Services LLC

Needham & Company, LLC

Neuberger Berman, LLC

Nine Chapters Capital Management, LLC

Northeast Utilities

Northern Trust Company

Peregrine Capital Management

Point72 Select Investments, LLC

Portolan Capital Management. LLC

Potamus Trading, LLC

Prime Broker Group

PWM Execution Services

Quantitative Investment Management, LLC

Quantitative Tactical

Quartys Limited-Bank Prime US

Raymond James & Associates, Inc.

RBC Capital Markets, LLC

Rhumbline Pacific Gas & Electric

Robert T Pizzano Syndicate

Royce & Associates, LLC

SAC Capital Advisors, LLC

SAC Capital Advisors, LP

Sanford C Bernstein & Co., LLC

SG Cowen Securities, Corp.

Speedroute, LLC

Spire X Trading, LLC

Step, LLC

Stephens, Inc.

Stevens Capital Management LP

Sun Trading

Timber Hill, LLC

Tradebot

Tradestation Securities, Inc.

Two Sigma Investments, LP

US Swaps Single Stock Average

Virtu Americas, LLC

Virtu Financial

Visium Asset Management, LP

Walleye Trading

Wang Investment Associates, Inc.

Wellington Management

Wells Fargo, N.A.

Whitney Capital Series Fund, LLC

WHM Falconwood Investors (Cayman), LP

Yee Consulting Inc.

s/ Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The government submits that the briefs adequately set forth the facts and law relevant to deciding this case and that oral argument would not substantially aid the Court.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT....................................i

TABLE OF AUTHORITIES ........................................................iii

JURISDICTIONAL STATEMENT...............................................1

STATEMENT OF THE CASE ....................................................2

    I.    Procedural History....................................................2

    II.    Statement of the Facts..............................................3

        A.    DiMaria's fraudulent scheme to inflate Bankrate's earnings ........................................................3

        B.    DiMaria's conviction, sentencing, and collateral attack ......5

    III.    Ruling Under Review ...............................................12

SUMMARY OF ARGUMENT ....................................................12

ARGUMENT .......................................................................13

    I.    The District Court Correctly Held That DiMaria Failed To Show That Counsel Was Constitutionally Ineffective For Failing To Investigate. .............................................13

        A.    Standard of Review.......................................14

        B.    Discussion.................................................14

    II.    The District Court Correctly Held That DiMaria Failed To Show That Counsel Was Constitutionally Ineffective For Failing To Advise Him Regarding Loss. ...................20

        A.    Standard of Review.......................................21

        B.    Discussion.................................................21

CONCLUSION....................................................................26

# TABLE OF AUTHORITIES

## Cases

*Barker v. United States*,
    7 F.3d 629 (7th Cir. 1993) ........................................................ 19

*Blackledge v. Allison*,
    431 U.S. 63 (1977) ................................................................... 19

*Campbell v. United States*,
    743 F. App'x 412 (11th Cir. 2018) .......................................... 17

*Diveroli v. United States*,
    803 F.3d 1258 (11th Cir. 2015) ............................................... 25

*Gordon v. United States*,
    518 F.3d 1291 (11th Cir. 2008) ............................................... 18

*Hill v. Lockhart*,
    474 U.S. 52 (1985) ............................................................. 14, 15

*Long v. United States*,
    883 F.2d 966 (11th Cir. 1989) (per curiam) ............................ 25

*Lynn v. United States*,
    365 F.3d 1225 (11th Cir. 2004) ............................................... 14

*Padilla v. Kentucky*,
    559 U.S. 356 (2010) ................................................................ 15

*Pericles v. United States*,
    567 F. App'x 776 (11th Cir. 2014) .......................................... 17

*Presendieu v. United States*,
    No. 21-12552, 2022 WL 4115147 (11th Cir. Sept. 9, 2022)
    (unpublished) ......................................................................... 22

*Puiatti v. Sec'y, Fla. Dep't of Corr.*,
    732 F.3d 1255 (11th Cir. 2013) ............................................... 18

*Rosin v. United States*,
   786 F.3d 873 (11th Cir. 2015) ............................................................. 13, 14

*Stillwell v. United States*,
   709 F. App'x 585 (11th Cir. 2017) ........................................................... 19

*Strickland v. Washington*,
   466 U.S. 668 (1984) ........................................................................ 13, 14

*United States v. Lerner*,
   No. 1:17-cr-20235 (S.D. Fla. Oct. 12, 2017) ........................................... 24

*United States v. Stein*,
   846 F.3d 1135 (11th Cir. 2017) ............................................ 12, 13, 22, 23

*Williams v. McNeil*,
   557 F.3d 1287 (11th Cir. 2009) .............................................................. 22

**Statutes and Rules**

17 C.F.R. § 240.13b2-1 ............................................................................... 2

17 C.F.R. § 240.13b2-2 ............................................................................... 2

15 U.S.C. § 78m .......................................................................................... 2

15 U.S.C. § 78ff .......................................................................................... 2

18 U.S.C. § 371 ........................................................................................... 2

18 U.S.C. § 1001 ......................................................................................... 2

18 U.S.C. § 1343 ......................................................................................... 2

18 U.S.C. § 1348 ......................................................................................... 2

18 U.S.C. § 1349 ......................................................................................... 2

18 U.S.C. § 3231 ......................................................................................... 1

28 U.S.C. § 1291 ......................................................................................... 1

iv

28 U.S.C. § 2253 ........................................................................ 1

28 U.S.C. § 2255 ................................................................. passim

U.S.S.G. § 2B1.1................................................................. passim

**Other Authorities**

Press Release, U.S. Department of Justice, Bankrate Inc.'s
   Successor in Interest Agrees to Pay $28 Million to Resolve
   Securities and Accounting Fraud Charges (Mar. 6, 2019),
   https://www.justice.gov/opa/pr/bankrate-inc-s-successor-
   interest-agrees-pay-28-million-resolve-securities-and-accounting
   (last visited Oct. 11, 2023)..................................................... 24

## JURISDICTIONAL STATEMENT

Petitioner-Appellant Edward J. DiMaria appeals from the district court's denial of his motion filed pursuant to 28 U.S.C. § 2255. The district court (Moore, J.) had jurisdiction under 18 U.S.C. § 3231 and 28 U.S.C. § 2255. The court entered its order on March 3, 2022, Civ.DE.18,[1] and DiMaria filed a timely notice of appeal on May 1, 2022, Civ.DE.19. This Court has jurisdiction under 28 U.S.C. § 1291, 28 U.S.C. § 2253(c)(1)(B), and 28 U.S.C. § 2255(d).

## STATEMENT OF THE ISSUES

1.    Whether the district court appropriately exercised its discretion in denying, without an evidentiary hearing, DiMaria's claim that counsel was ineffective for failing to investigate his case adequately.

2.    Whether the district court appropriately exercised its discretion in denying, without an evidentiary hearing, DiMaria's claim that counsel was ineffective during the plea-negotiation stage for failing to advise him regarding the calculation of financial loss under U.S.S.G. § 2B1.1.

---

[1] "Civ.DE" refers to a district court docket entry in the civil case below; "Crim.DE" refers to a district court docket entry in DiMaria's underlying criminal case, No. 1:17-cr-20898; and "COA.DE" refers to a docket entry in this Court. "Br." refers to DiMaria's opening brief. "PSR" refers to the final Presentence Investigation Report; "PSR Add." refers to the addendum.

## STATEMENT OF THE CASE

### I.    Procedural History

A federal grand jury in the Southern District of Florida returned an indictment charging DiMaria with one count of conspiracy to make false statements to a public company's accountants and to falsify a public company's books and records, in violation of 18 U.S.C. § 371; three counts of making false statements to accountants, in violation of 17 C.F.R. § 240.13b2-2 and 15 U.S.C. § 78ff(a); six counts of making false entries in a public company's books and records, in violation of 17 C.F.R. § 240.13b2-1 and 15 U.S.C. §§ 78m(b) and 78ff(a); one count of conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 1349; one count of wire fraud, in violation of 18 U.S.C. § 1343; and one count of securities fraud, in violation of 18 U.S.C. § 1348. Crim.DE.1.  The grand jury subsequently returned a superseding indictment removing three of the false-entry counts.  Crim.DE.58.

DiMaria pleaded guilty, pursuant to a written plea agreement, to one count of conspiracy to make false statements to accountants, to falsify a public company's books and records, and to commit securities fraud, in violation of 18 U.S.C. § 371; and one count of making false statements in a filing with the Securities and Exchange Commission ("SEC"), in violation of 18 U.S.C. § 1001(a)(2).  Crim.DE.64, 68.  The district court sentenced DiMaria to 120

months of imprisonment (the statutory maximum), to be followed by three years of supervised release.  Crim.DE.83; *see* Crim.DE.68:4.

DiMaria filed a motion for post-conviction relief under 28 U.S.C. § 2255. Civ.DE.1.  Following briefing, the district court denied his motion and declined to issue a certificate of appealability.  Civ.DE.18.  This Court later issued a certificate of appealability with respect to the two above-listed issues. COA.DE.15.

## II.    Statement of the Facts

### A.    DiMaria's fraudulent scheme to inflate Bankrate's earnings

DiMaria was the Chief Financial Officer of Bankrate, a marketing and financial publishing company.  Crim.DE.69:1.  As a publicly traded company registered with the SEC, Bankrate filed quarterly and annual reports with the SEC that stated, among other things, Bankrate's revenue; its earnings per share ("EPS"); and its earnings before interest, taxes, depreciation, and amortization ("EBITDA").  Crim.DE.69:1-2.  Bankrate also provided "adjusted" earnings calculations, which purportedly excluded certain specific expenses from its earnings totals.  Crim.DE.69:2.

DiMaria conspired to, and did, falsely inflate Bankrate's reported earnings and "adjusted" earnings in two ways.  Crim.DE.69:2-3.  First, DiMaria and his co-conspirators maintained a spreadsheet, which they described as their

3

"cushion," to keep track of unsupported and improperly recorded expense accruals. Crim.DE.69:2. Rather than reversing those improperly recorded expense accruals immediately, as the accounting rules required, the conspirators held onto their "cushion" and used it by selectively reversing certain expense accruals in *later* quarters, thereby falsely inflating Bankrate's publicly reported earnings and "adjusted" earnings in those quarters. Crim.DE.69:2. Second, DiMaria and his co-conspirators falsely inflated Bankrate's "adjusted" earnings by directing Bankrate's finance department to improperly categorize certain routine fees and expenses. Crim.DE.69:2-3. This caused those expenses to be excluded from "adjusted" earnings figures that were disclosed to investors, leading to exaggerated adjusted EPS and adjusted EBITDA reports. Crim.DE.69:3.

DiMaria and his co-conspirators also caused false statements to be made in connection with their manipulation of Bankrate's earnings. Between June 2011 and September 2014, DiMaria signed letters to Bankrate's auditors that falsely certified that, among other things, (1) he "had made available to Bankrate's auditors all financial records and related data of Bankrate;" (2) he "had no knowledge of fraud or suspected fraud affecting Bankrate involving Bankrate's management;" and (3) he was "not aware of any information indicating that an illegal act . . . had or may have occurred . . . ." Crim.DE.69:3.

4

After having reversed certain expense accruals from the "cushion" spreadsheet, DiMaria also caused Bankrate to file materially false statements with the SEC, including false earnings figures in its first-quarter 2012 statements. Crim.DE.69:3.

**B.    DiMaria's conviction, sentencing, and collateral attack**

1.    DiMaria entered a plea agreement in which he agreed to plead guilty to one conspiracy count and one false-statement count. Crim.DE.64, 68. Through the agreement and its factual basis, DiMaria agreed, among other things, that: the government would have proved the above-described facts beyond a reasonable doubt had the case proceeded to trial; the total statutory maximum term of imprisonment DiMaria faced was 10 years; DiMaria's commission of the offenses to which he was pleading guilty resulted in a loss of at least $25 million; and, although the district court would ultimately determine his sentence, he and the government would jointly recommend a total Guidelines offense level of 37, including a 22-level increase under U.S.S.G. § 2B1.1(b)(1)(L) "because the actual or intended loss was between $25,000,000 and $65,000,000." Crim.DE.68, 69.

At the change-of-plea hearing, DiMaria confirmed that he understood the two charges, had had sufficient time to discuss the charges with counsel, and was fully satisfied with counsel's advice. Crim.DE.73:7-11, 16. The magistrate

judge reviewed the plea agreement's provisions in detail, and DiMaria confirmed that he fully understood them, including the provision regarding loss and its effect on the Guidelines calculation.  Crim.DE.73:18-29.  The judge also confirmed that DiMaria understood the elements of both offenses.  Crim.DE.73:29-35.  Additionally, the judge asked the government to "read or summarize the agreed factual basis" as well as "to describe how the loss amount was calculated, since that does not appear in the written factual basis."  Crim.DE.73:39.  After describing the agreed-upon facts, the government summarized the agreed-to loss calculation:

> The government retained a forensic accounting firm, obtained shareholder information for Bankrate, and identified specific accounts who held Bankrate stock on two different dates, when first Bankrate public[ly] reported for the first time in September 2014 that Bankrate's financial statements could no longer be relied upon, shareholders in Bankrate stock at that time suffered a loss due to the decline in Bankrate stock.
>
> In addition, in a later period of time, Bankrate then, in fact, did restate its financial statements and at that time Bankrate stock, again, suffered a loss due to the public announcement of the restated financial statements.
>
> The government has gone through specific brokerage accounts, identified individual investors who have suffered losses, the value of their Bankrate shares during those two different periods of time.

Crim.DE.73:40-46.  The government explained that, based on that analysis, the approximate total investor loss was "[s]lightly above 25 million."  Crim.DE.73:46.  DiMaria stated that he had no "additions or corrections" to

the factual basis and agreed that the government would have been able to prove those facts beyond a reasonable doubt at trial.  Crim.DE.73:46.

2.    The Probation Office prepared a presentence investigation report, which reflected, among other things, DiMaria's admission that his "offense resulted in a loss of at least $25,000,000" as well as a detailed explanation of the loss calculation.    PSR ¶¶ 4, 47; *see also* Crim.DE.80:7, 11 (government sentencing memorandum noting loss amount was based on "[i]nvestors who sold their shares in the three trading days following each of" two Bankrate announcements and adding that "the government has been able to specifically identify 273 victims entitled to restitution").  DiMaria had no objections to the loss calculation.  *See* PSR Add.

Consistent with the plea agreement, the parties at sentencing agreed to the Guidelines offense level of 37, which, due to the 10-year statutory maximum, resulted in a Guidelines range of 120 months of imprisonment.  Crim.DE.84:3; *see* Crim.DE.78:30 (DiMaria acknowledging in sentencing memorandum that Guidelines range would have been 210-262 months absent statutory maximum). After hearing from counsel and DiMaria,[2] the district court observed that the

---

[2] DiMaria expressed remorse, stating, "I am sorry for the harm I caused the stockholders of Bankrate[;] my lapse in judgment as CFO of Bankrate[] broke the trust of the people I was serving. . . .  I recognize that my actions were wrong and showed disregard for the professional standards executives are and should be held to."  Crim.DE.84:3-4.

charges to which DiMaria had pleaded guilty substantially reduced his sentencing exposure—from multiple counts with statutory maximums of at least 20 years to two counts with a combined 10-year maximum.  Crim.DE.84:13-14 (noting difference between potential Guidelines range and statutory maximum and observing that DiMaria had "already received the benefit of a substantial bargain that he entered into with the government"); *see* Crim.DE.58:30-31 (superseding indictment penalty sheet reflecting total combined statutory maximum of 190 years of imprisonment).  The court then sentenced DiMaria to 120 months of imprisonment and ordered him to pay over $21 million in restitution.  Crim.DE.84:17.

3.    DiMaria then filed a § 2255 motion requesting an evidentiary hearing and discovery as well as vacatur of his conviction and sentence.  Civ.DE.1.  DiMaria argued, as relevant here, that his counsel "fail[ed] to perform and/or complete an adequate investigation that would have established that [DiMaria] was and is actually innocent," in part because internal Bankrate investigations purportedly concluded "that no fraud or criminal activity had occurred," and that "four reports prepared by potential expert witnesses" were also exculpatory.  Civ.DE.1:14-15.  DiMaria asserted that, "[d]espite having access to the above information, counsel failed to adequately investigate," and that, had counsel discovered various factual assertions set forth in the motion,

DiMaria "would not have pled guilty[] and would have insisted on going to trial." Civ. DE.1:15-17. DiMaria also contended that his counsel "provided ineffective representation in agreeing to waive, advising [DiMaria] to waive, and failing to raise at sentencing any challenge to" the agreed-upon loss amount when, if counsel had challenged the loss amount, "the actual loss amount would have been between zero and $40,000.00," resulting in "a corresponding sentencing range of 30-37 months." Civ.DE.1:19-21. In response, the government contended that DiMaria's counsel had provided constitutionally effective assistance. Civ.DE.5. The government specifically observed with respect to Bankrate's internal investigations that: "1) [DiMaria] participated in these investigations, was aware of their findings, and still chose to enter a guilty plea; 2) the investigations and their conclusions were known to [DiMaria]'s trial counsel through discovery provided in the criminal matter and during a previous SEC matter; 3) [DiMaria] acknowledged within his plea agreement and under oath that he and his co-conspirators misled Bankrate's independent auditors; and 4) . . . Bankrate ultimately determined it was necessary to restate its financial statements as a result of [DiMaria]'s accounting fraud scheme." Civ.DE.5:9. With respect to the loss calculation, the government emphasized that DiMaria had agreed under oath to the factual basis supporting his guilty plea, including

the loss amount, and that DiMaria had acknowledged at sentencing that his actions harmed Bankrate shareholders.  Civ.DE.5:11-12.

The magistrate judge recommended denial of DiMaria's motion without an evidentiary hearing.  Civ.DE.11.  With respect to the inadequate-investigation claim, the judge found DiMaria's reasoning "conclusory." Civ.DE.11:12.  Of note, the judge explained that DiMaria did not dispute that he and his counsel were aware of the internal Bankrate investigations, that DiMaria himself participated in the investigations as Bankrate's Chief Financial Officer, and that DiMaria's present motion provided no support for its various factual assertions, including the claim "that the accounting errors attributable to DiMaria were not material."  Civ.DE.11:11-13.  Similarly, with respect to the loss-amount claim, the judge found that "DiMaria provide[d] a conclusory statement that Trial Counsel misunderstood the law without any further explanation" and then rejected his claim that the loss calculation was "'unfounded.'"    Civ.DE.11:15-16.    The judge cited the government's explanation of the calculation at the plea hearing and DiMaria's on-the-record agreement that the loss calculation was correct.  Civ.DE.11:15-16.  The judge further reasoned that, in light of the substantial benefit DiMaria received by pleading guilty (in the form of exposure to a sentence of no more than 10 years'

10

imprisonment), DiMaria's counsel reasonably advised him to accept the loss calculation.  Civ.DE.11:16-17.

4.    The district court adopted the magistrate judge's Report & Recommendation and overruled DiMaria's objections (which the court characterized as raising "virtually the same arguments" advanced to the magistrate judge).  Civ.DE.18.  With respect to the inadequate-investigation claim, the court agreed with the magistrate judge that DiMaria's arguments regarding the internal Bankrate investigations were "conclusory," particularly in light of DiMaria's own participation in those investigations and his statements in his plea agreement and during his plea hearing "that he understood all aspects of the charges against him."  Civ.DE.18:11-13.  Similarly, with respect to the loss-amount claim, the court approvingly cited the magistrate judge's findings that the government explained the loss amount at DiMaria's plea hearing and that DiMaria repeatedly agreed that the loss amount was correct.  Civ.DE.18:7-9.  The court further emphasized that DiMaria's counsel made a reasonable strategic choice to advise him to agree to the loss amount in light of the substantial reduction in the maximum term of imprisonment DiMaria faced.  Civ.DE.18:9-10.

Relatedly, the district court noted that DiMaria argued for the first time in his objections to the Report & Recommendation that the loss amount was

incorrect under *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017), in which this Court held that, in the context of proving that a fraud defendant caused investors' losses under U.S.S.G. § 2B1.1, the government must provide direct or circumstantial evidence that investors *relied* on a defendant's fraudulent information.  Civ.DE.18:7, 10.  The court deemed DiMaria's arguments under *Stein* waived because he raised them for the first time in his objections; the court further explained that, in any event, *Stein* was inapposite "because the defendant in *Stein* was convicted by a jury and the district court was therefore not provided with a stipulated loss amount."  Civ.DE.18:10-11.

## III.  Ruling Under Review

DiMaria challenges the district court's denial of his § 2255 motion without an evidentiary hearing.  Civ.DE.18.

### SUMMARY OF ARGUMENT

1.     The district court properly exercised its discretion in rejecting, without an evidentiary hearing, DiMaria's claim that his counsel was ineffective for failing to investigate his case adequately.  The materials DiMaria contends his counsel should have investigated were in DiMaria's and his counsel's possession, and DiMaria's conclusory factual assertions that his counsel should have discovered them do not establish a reasonable probability that the result of the proceeding would have been different.  On this record, DiMaria cannot show

either that "(1) his trial counsel's 'performance was deficient' [or] (2) that his trial counsel's 'deficient performance prejudiced the defense.'" *Rosin v. United States*, 786 F.3d 873, 877 (11th Cir. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

2.     The district court likewise properly exercised its discretion in rejecting, without an evidentiary hearing, DiMaria's claim that his counsel was ineffective for inadequately advising him during the plea-negotiation process regarding the calculation of loss under U.S.S.G. § 2B1.1.  The record contradicts DiMaria's claim that he did not understand the loss calculation and that he was advised to "blindly" accept the government's figure, and nothing in the record supports DiMaria's claim that the loss amount was overstated or inconsistent with this Court's decision in *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017). Further, in light of the substantial benefit DiMaria received by pleading guilty, he cannot show that the result of the proceeding would have been different had he received different advice.

## ARGUMENT

### I.     The District Court Correctly Held That DiMaria Failed To Show That Counsel Was Constitutionally Ineffective For Failing To Investigate.

DiMaria first argues (Br. 16-30) that the district court erred in denying, without an evidentiary hearing, his claim that his counsel was ineffective for failing to investigate his case adequately.  DiMaria's claim is baseless.

13

### A.    Standard of Review

In a § 2255 proceeding, this Court reviews legal issues *de novo* and findings of fact for clear error. *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004). This Court reviews a district court's denial of a petitioner's request for an evidentiary hearing for abuse of discretion. *Rosin v. United States*, 786 F.3d 873, 877 (11th Cir. 2015). "The district court is not required to grant a petitioner an evidentiary hearing if the § 2255 motion 'and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Id.* (quoting 28 U.S.C. § 2255(b)). "[A]n evidentiary hearing is unnecessary when the petitioner's allegations are affirmatively contradicted by the record or if such claims are patently frivolous." *Id.* (internal quotation marks omitted).

### B.    Discussion

"When a challenge to the validity of a conviction on the basis of ineffective assistance of counsel arises in the context of the plea process," this Court applies the two-part framework from *Strickland v. Washington*, 466 U.S. 668 (1984). *Rosin*, 786 F.3d at 877 (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). "Therefore, in order to be entitled to an evidentiary hearing on any such challenge, a defendant must show that: (1) his trial counsel's 'performance was deficient' and (2) that his trial counsel's 'deficient performance prejudiced the defense.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). The deficient-performance

prong requires a showing that counsel has "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," as judged by a standard of "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 687-688. "Judicial scrutiny of counsel's performance must be highly deferential" and respects "a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 689. The prejudice prong requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the context of alleged "failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Hill*, 474 U.S. at 59. "Moreover, to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).

As the district court correctly held, the record conclusively refutes DiMaria's assertions that counsel performed deficiently by failing to investigate his case adequately and that any deficient performance caused prejudice.

*First*, with respect to deficient performance, the only specific materials that counsel allegedly failed to investigate were purportedly exculpatory internal Bankrate investigative reports and "reports prepared by potential expert witnesses."  Civ.DE.1:2.  As an initial matter, DiMaria overstates the exculpatory quality of the internal reports.  The Grant Thornton report is a barebones, one-page summary asserting that Bankrate's financial statements "present fairly, in all material respects, the financial position of Bankrate . . . ."  Civ.DE.15:22.  And the Wachtell Lipton document outlines a presentation to the SEC purporting to explain various documents as reflecting no evidence of material misstatements.  Civ.DE.15:24-63.  Critically, both reports were prepared during the conspiracy while DiMaria was serving as Bankrate's Chief Financial Officer and, by DiMaria's own admission, lying to Grant Thornton.  Crim.DE.69:3; *see* PSR ¶¶ 43-46 (describing conspiracy's concealment of false and misleading entries from Accounting Firm A, *i.e.*, Grant Thornton); Br. 21 (identifying Accounting Firm A).  And the reports' conclusions that no material misstatements occurred were contradicted by Bankrate's later filing of restated financials, *see* PSR ¶ 47, and by DiMaria's own admissions in his plea agreement, Crim.DE:69.

In any event, DiMaria has never disputed that he and his trial counsel possessed the reports of Bankrate's internal investigations when negotiating

16

DiMaria's plea—or, indeed, that DiMaria personally participated in those investigations in his capacity as Bankrate's Chief Financial Officer when the investigations took place. *See* Civ.DE.18:12-14 (district court noting these facts); *see also Pericles v. United States*, 567 F. App'x 776, 781 (11th Cir. 2014) (rejecting argument that attorney performed deficiently by failing to investigate petitioner's criminal history in part because petitioner "did not need for his attorney to go searching for information that he himself possessed"). And the existence of purportedly exculpatory "reports prepared by potential expert witnesses," which DiMaria apparently did not provide to the district court, *see* Br. 26 n.3, suggests that DiMaria's trial counsel diligently investigated potential defenses before ultimately advising DiMaria to plead guilty.[3]

DiMaria nebulously contended before the district court that, "[d]espite having access to the above information, counsel failed to adequately investigate," but DiMaria did not specifically explain what any further investigation might have entailed. Civ.DE.1:3. Counsel's decision not to

---

[3] Counsel's diligence was also evident at a hearing on a motion to transfer venue, at which counsel discussed the voluminous discovery and listed numerous likely defense witnesses, including "one of the lead auditors" for a firm that conducted one of Bankrate's internal investigations. Crim.DE.36:14-15; *see Campbell v. United States*, 743 F. App'x 412, 417-418 (11th Cir. 2018) (affirming denial of § 2255 petition without evidentiary hearing and rejecting claim counsel failed to adequately investigate, noting pretrial counsel "was familiar with applicable . . . law and the facts of the case, which he presented" at a suppression hearing).

investigate further "is accorded a strong presumption of reasonableness, and to be effective a lawyer is not required to pursue every path until it bears fruit or until all hope withers." *Puiatti v. Sec'y, Fla. Dep't of Corr.*, 732 F.3d 1255, 1280 (11th Cir. 2013) (internal quotation marks and citation omitted); *see generally Gordon v. United States*, 518 F.3d 1291, 1302 (11th Cir. 2008) ("When we can conceive of a reasonable motivation for counsel's actions, we will deny a claim of ineffective assistance without an evidentiary hearing.").  Because DiMaria has not explained what more his counsel should have done, this Court should affirm the district court's determination that DiMaria's counsel "made a reasonable strategic decision to advise [him] to plead guilty."  Civ.DE.18:14.

*Second*, with respect to prejudice, DiMaria's claim that he "would have insisted on going to trial" if his counsel had investigated further, Civ.DE.1:5, is belied by the record.  The "facts" DiMaria asserted further investigation would have revealed are, at most,[4] baseless assertions that DiMaria is actually innocent

---

[4] Several of the "facts" appear to be irrelevant to DiMaria's guilt, and DiMaria has never specifically articulated how discovery of such facts would have affected his decision to plead guilty.  For instance, DiMaria asserted that diligent investigation would have revealed that "[t]here was no criminality in any aspect of [his] stock sales" months after much of the charged conduct occurred and that, at some unspecified point in time, he "hired personnel and implemented programs to improve the accuracy of Bankrate's accounting systems."  Civ.DE.1:4-5.  It is unclear how these proffered, conclusory factual assertions could have been relevant to DiMaria's guilt or to his decision not to risk trial.

because his manipulations of Bankrate's financial reports were not material. Civ.DE.1:3-5 (asserting accounting entries were either "judgmental errors" or "simply not material," amounts set aside as "cushion" were "not material," and "any misstatements or omissions" communicated to auditors "were simply not material"). But DiMaria confirmed on the record during his plea hearing that he well understood the elements of the offenses to which he had decided to plead guilty, including materiality, which the magistrate judge defined in plain language. Crim.DE.73:29-35. He further confirmed that he was pleading guilty because he was guilty, that he had read the factual basis and reviewed it with his counsel, and that the factual basis was entirely accurate. Crim.DE.73:38-39. These "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Thus, even if DiMaria's counsel performed deficiently by failing to uncover the "facts" DiMaria proffered, the record demonstrates that access to those "facts" would not have changed DiMaria's fully informed decision to plead guilty following the district court's explanation of the elements of the offenses. *See Stillwell v. United States*, 709 F. App'x 585, 590 (11th Cir. 2017) (holding petitioner could not show counsel's advice regarding guilty plea caused prejudice because "any misunderstanding created by counsel's advice was remedied by the district court"); *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) (holding that, even

if petitioner's counsel led to "misunderstanding of the consequences of [petitioner's] guilty plea, any such confusion was cured by the trial court" at the plea hearing).

On appeal, DiMaria largely rehashes the arguments that the district court correctly rejected below. Br. 19-26. His additional contention that a table reflecting Bankrate's reported financial outcomes for several quarters in 2011 and 2012 "demonstrates the exact opposite of what a cookie jar accounting scheme is designed to accomplish" (Br. 27-28) is meritless. His argument is, in essence, that if DiMaria and his co-conspirators were using the "cushion" (or "cookie jar") to manipulate Bankrate's reported expenses and earnings, they would have done so *more often* and more successfully. Br. 28 ("The quarter was missed by 2 million and yet Mr. DiMaria did not engage in the practice the government accused him of, despite having a perfect opportunity . . . ."). That DiMaria's fraud was not more brazen or more successful in no way undermines his sworn admissions that he committed the crimes set forth in his plea agreement.

## II. The District Court Correctly Held That DiMaria Failed To Show That Counsel Was Constitutionally Ineffective For Failing To Advise Him Regarding Loss.

DiMaria next argues (Br. 30-33) that the district court erred in denying, without an evidentiary hearing, his claim that counsel was ineffective for failing

to adequately advise him during the plea-negotiation stage regarding the calculation of loss under U.S.S.G. § 2B1.1.  This claim fails as well.

## A.    Standard of Review

The standard of review set forth above, p. 14, applies here.

## B.    Discussion

Under *Strickland*, the record conclusively negates DiMaria's contention that his counsel performed deficiently or caused prejudice in connection with DiMaria's understanding of the loss-amount calculation at the time of his plea.

*First*, with respect to deficient performance, nothing in the record supports DiMaria's contention that he lacked "an adequate explanation . . . as to how th[e] loss figure was calculated" or that counsel acted unreasonably "in advising him to blindly accept the government's loss calculation, plead guilty, and proceed to sentencing."  Br. 30-32.  DiMaria himself agreed repeatedly—in his plea agreement and at his plea hearing—that his crimes caused at least $25 million in losses and that the government could have proved as much beyond a reasonable doubt.  Crim.DE.68:5; Crim.DE.73:21-22, 45-46.  In fact, DiMaria expressed such agreement at the plea hearing *after* the government detailed the manner in which it had calculated the loss.  Crim.DE.73:46.  It is unclear what DiMaria's counsel should have done differently given DiMaria's own admissions that his fraudulent actions caused investors' losses.  *Cf. Presendieu v.*

*United States*, No. 21-12552, 2022 WL 4115147, at *5 (11th Cir. Sept. 9, 2022) (unpublished) (rejecting argument that petitioner's counsel was ineffective for failing to object to loss calculation where petitioner offered only "his own uncredited testimony" and the fact that several codefendants were resentenced with lower loss amounts years later).

Further, DiMaria has failed to show that the loss amount was incorrectly calculated. DiMaria's argument that "the government's simplistic loss formulation is at odds with" *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017) (Br. 31), fails for several reasons. First, the district court correctly observed that DiMaria's original motion merely "provided a conclusory statement that Trial Counsel misunderstood the law" and that his later arguments under *Stein* were untimely because they had not been presented to the magistrate judge. Civ.DE.18:10-11 (internal quotation marks and brackets omitted); *see Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) (holding district courts have discretion to decline to consider arguments not first presented to magistrate judges). Second, as the district court correctly held, *Stein* is inapposite. Civ.DE.18:11. There, this Court vacated the defendant's sentence because the government had failed to prove investors had suffered losses under U.S.S.G. § 2B1.1 by showing "that the investors relied on [the defendant's] fraudulent information," either through "individualized evidence of reliance" or "specific

22

circumstantial evidence." *Stein*, 846 F.3d at 1153. But *Stein* involved a conviction following trial and a contested loss dispute at sentencing. The Guidelines calculation in this case, by contrast, was based on DiMaria's stipulation that the government could have proved loss beyond a reasonable doubt. Third, the record shows that the government's loss calculation aligned with *Stein*: the government explained that it had calculated loss by identifying "specific brokerage accounts" and "individual investors" who suffered actual losses in the days following specific Bankrate disclosures. Crim.DE.73:45-46; *see also* PSR ¶ 47 (explaining loss was calculated based on volume of shares *sold* by investors following disclosures). The government did not—as DiMaria mistakenly asserts—calculate loss by simply multiplying the magnitude of decreases in Bankrate's share price following disclosures of the fraud "by the number of outstanding shares" (Br. 31).

Additionally, at the time DiMaria entered his plea agreement, DiMaria's co-conspirator, former Bankrate Vice President of Finance Hyunjin Lerner, had admitted in his own plea proceedings that the conspiracy caused the same loss amount, suggesting that an effort to challenge or relitigate the loss amount in DiMaria's case would have been futile. *See* Plea Agreement at 7, *United States v.*

*Lerner*, No. 1:17-cr-20235 (S.D. Fla. Oct. 12, 2017), ECF No. 46; *see also* Crim.DE.64:2-3 (superseding information describing Lerner's role).[5]

*Second*, with respect to prejudice, even if DiMaria's counsel provided deficient advice regarding the loss calculation during the plea-negotiation process, DiMaria cannot show that, had he received different advice, he would have rejected the plea agreement and proceeded to trial. As the district court repeatedly observed, DiMaria obtained a substantial benefit by agreeing to plead guilty. He dramatically reduced his potential sentence to a maximum of 10 years of imprisonment, far below what would have been his Guidelines range. Crim.DE.84:14-15 ("So the fact that Mr. DiMaria is exposed to no more than ten years to me suggests that he has already received the benefit of a substantial bargain that he entered into with the government. Had he gone to trial on the original indictment, he would have been looking at at least double of what he is exposed to here. So he's already been more than favorably and generously treated by the government with the plea agreement that was entered into."); Civ.DE.18:9. Under these circumstances, the record refutes DiMaria's claim

---

[5] Bankrate's corporate successor in interest also admitted to the same loss amount in a later-entered non-prosecution agreement. Press Release, U.S. Department of Justice, Bankrate Inc.'s Successor in Interest Agrees to Pay $28 Million to Resolve Securities and Accounting Fraud Charges (Mar. 6, 2019), https://www.justice.gov/opa/pr/bankrate-inc-s-successor-interest-agrees-pay-28-million-resolve-securities-and-accounting (last visited Oct. 11, 2023).

that he would have proceeded to trial had counsel provided different guidance with respect to the loss calculation. *See Diveroli v. United States*, 803 F.3d 1258, 1265 (11th Cir. 2015) (holding district court correctly determined, without an evidentiary hearing, no reasonable probability that petitioner would have rejected guilty plea and gone to trial, in part because of plea agreement's "favorable terms," including allowing petitioner to plead to one offense carrying a five-year statutory maximum while dismissing multiple counts carrying 20-year statutory maximums); *Long v. United States*, 883 F.2d 966, 970 (11th Cir. 1989) (per curiam) (rejecting argument petitioner would not have pleaded guilty had he known maximum penalty had he proceeded to trial was 15, rather than 25, years, noting that "even a [15]-year sentence is formidable in comparison to a plea bargain promising a probationary term"). This Court should accordingly reject DiMaria's claim that his counsel was ineffective.

## CONCLUSION

For these reasons, this Court should affirm the district court's denial of DiMaria's motion without an evidentiary hearing.

Respectfully submitted,

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

October 11, 2023

## CERTIFICATE OF SERVICE

I certify that on October 11, 2023, I caused the foregoing brief to be served upon all Filing Users through the Court's Case Management/Electronic Case Files ("CM/ECF") system.

s/ Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 5,441 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared in a proportionally spaced, 14-point font in text and footnotes using Word for Microsoft 365.

s/  Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov
