# No. 22-11470-A

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**EDWARD J. DIMARIA,**

**Movant/Appellant,**

**v.**

**UNITED STATES OF AMERICA,**

**Respondent/Appellee.**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

---

## REPLY BRIEF OF THE APPELLANT
## EDWARD J. DIMARIA

---

**RICHARD C. KLUGH, ESQ.**
**Counsel for Appellant**
**40 N.W. 3rd Street, PH 1**
**Miami, Florida 33128**
**Tel. No. (305) 536-1191**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

**Edward J. DiMaria v. United States, Case No. 22-11470-A**

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Becerra, Hon. Jacqueline, United States Magistrate Judge

Bergendahl, John E., Counsel for Appellant

Covert, Jason M., Department of Justice Attorney

Fajardo, Ariana, Former United States Attorney

Gonzalez, Juan Anthony, United States Attorney

Klugh, Richard C., Counsel for Appellant

Laing, Andrew, Department of Justice Attorney

Moore, Hon. K. Michael, United States District Judge

Rubio, Lisa Tobin, Assistant United States Attorney

Sanders, Jeremy R., Assistant United States Attorney

Scruggs, Emily C., Department of Justice Attorney

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . C1

REPLY ARGUMENT AND CITATIONS OF AUTHORITY . . . . . . . . . . . . . . . . 1

    I.    The district court erred in denying, without an evidentiary hearing, Mr. DiMaria's claim that counsel was ineffective for failing to adequately investigate his case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.    The district court erred in denying, without an evidentiary hearing, Mr. DiMaria's claim that counsel was ineffective during the plea negotiation stage by failing to advise him on how financial loss is calculated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF CITATIONS

**CASES:**

*Blackledge v. Allison*, 431 U.S. 63 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Fontaine v. United States*, 411 U.S. 213 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Gaines v. Hopper*, 575 F.2d 1147 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 1

*House v. Balkcom*, 725 F.2d 608 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*Marchibroda v. United States*, 368 U.S. 487 (1962) . . . . . . . . . . . . . . . . . . . . . . 13

*Tafero v. Wainwright*, 796 F.2d 1314 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 8

*Thompson v. Wainwright*, 787 F.2d 1447 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . 8

*United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017) . . . . . . . . . . . 14, 15, 16, 17

*Von Moltke v. Gillies*, 332 U.S. 708 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Walker v. Caldwell*, 476 F.2d 213, 217 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . 8

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATUTORY AND OTHER AUTHORITY:**

U.S. Const., amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15, 16, 19

<u>**REPLY ARGUMENT AND CITATIONS OF AUTHORITY**</u>

**I.    THE DISTRICT COURT ERRED IN DENYING, WITHOUT AN EVIDENTIARY HEARING, MR. DIMARIA'S CLAIM THAT COUNSEL WAS INEFFECTIVE FOR FAILING TO ADEQUATELY INVESTIGATE HIS CASE.**

The government posits a number of arguments in an effort to avoid the obvious—that is, counsel's woefully deficient performance in failing to properly investigate and develop exculpatory materials that were provided him on a silver platter and the prejudice to Mr. DiMaria that ultimately resulted from counsel's egregious incompetence. *See* GBr.15-20. The government's arguments lack merit and should be rejected in that there has never been a more clear-cut example of constitutionally deficient performance by a defense attorney in the plea representation context. To describe the performance as merely incompetent would be a charitable understatement.[1]

---

[1] The government apparently does not, and quite simply cannot quarrel with the central premise of Mr. DiMaria's claim— that the United States Supreme Court, and this Court, and prevailing professional standards of the American Bar Association require counsel in a criminal case to perform an adequate pretrial investigation. *See*, *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003); *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("At the heart of effective representation is the independent duty to investigate and prepare."); *Gaines v. Hopper*, 575 F.2d 1147, 1149–50 (5th Cir. 1978) ("[T]he cornerstones of effective assistance of counsel" are the "[i]nformed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case."); *House v. Balkcom*, 725 F.2d 608, 617 (11th (continued...)

1

To begin with, it is significant to note that the government, throughout the course of these post-conviction proceedings, has still failed to present any facts contradicting Mr. DiMaria's sworn claims of his counsel's ineffectiveness. Conspicuous by its absence is any affidavit or sworn assertions by Mr. DiMaria's former counsel refuting the allegations of counsel's failure to investigate and the subsequent misadvice he provided to Mr. DiMaria.

The government argues that "[a]s an initial matter, DiMaria overstates the exculpatory quality of the internal reports." GBr.16. And the government contends that the Grant Thornton report "is a barebones, one-page summary asserting that Bankrate's financial statements 'present, fairly, in all material respects, the financial position of Bankrate.'" *Id.* (quoting DE:15:22). As well, the government claims that the Wachtell Lipton document merely "outlines a presentation to the SEC purporting to explain various documents as reflecting no evidence of material misstatements." *Id.* The government is wrong and its argument simply ignores the importance of these two documents.

---

(...continued)
Cir. 1984) (The "admitted failure to investigate the facts is unconscionable and falls below the level of performance by counsel required by the sixth amendment."). *See also* ABA Standard 4-4.1 Duty to Investigate. Nor does the government in its brief make anything but a halfhearted argument that Mr. DiMaria's counsel's performance accorded with the dictates of the above cited decisional authority and ABA Standards.

Contrary to what the government claims, the Grant Thornton, DE:15, App.A, and Wachtel Lipton, DE:15, App.B, reports were not mere internal reports of Bankrate. Rather, they were the reports of external auditors and outside counsel, and the findings of those reports were the culmination of a careful review of all relevant Bankrate financial and accounting records. Nothing was hidden from the auditors or outside counsel, and the findings of those reports address the accounting matters that ultimately became the focus of the government's prosecution in this case.[2]

For example, a fair reading of the Grant Thornton report reveals precisely how extensive and thorough the conducted audit was. To begin with, although the government claims that the report was a Bankrate "*internal report*," GBr.16 (emphasis added), that contention is dispelled by the report itself, which reflects that it is the "REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM" and is addressed to the Board of Directors and Stockholders of Bankrate. DE:15:22.

In the report, the Grant Thorton auditors advised the Bankrate board and stockholders:

---

[2] In fact, in response to the government's "barebones" assertion, Mr. DiMaria is prepared to show at a hearing that the Grant Thornton audit team spent well over 4,000 work hours reviewing Bankrate's financials in conjunction with its investigation of the alleged accounting irregularities and related matters.

We have audited the accompanying consolidated balance sheets of Bankrate, Inc. ... and subsidiaries as of December 31, 2012, and 2011, and the related consolidated statements of comprehensive income, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2012. … Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Bankrate, Inc. and subsidiaries as of December 31, 2012, and 2011, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2012, in conformity with accounting principles generally accepted in the United States of America.

*Id.*[3]

---

[3] Moreover, the government's attempt to dismiss the report as merely a one-page summary discounts the accounting documents attached to the report. The report itself indicates that accompanying the report were the consolidated balance sheets of Bankrate, Inc. and its subsidiaries, and the related consolidated statements of comprehensive income and associated data. DE:15:22.

As to the Wachtel Lipton report, DE:15, App. B, the government again misapprehends and understates the significance of the findings. Specifically, with regard to materiality, and addressing the so-called cushion or cookie jar accounting entries that were the focus of the government's case, Wachtel Lipton found:

Materiality – To sum up:

- There is simply no reason to believe that the handling of any of these accruals could have had a material impact on Bankrate's financial results in any period

- It is not mathematically possible for there to have been a material impact on the financial statements in any period

  - In 3Q11 and 4Q11, the Company's results were so far in excess of consensus expectations, that release of any amount of accruals would not have had a noticeable effect

  - In 1Q12, the Company missed expectations and did not release accruals in order to bridge that gap – even though the gap wasn't very large

  - In 2Q12, the Company met EPS and EBITDA expectations, with no evidence of any adjustment to the accruals

DE:15:45 (emphasis in original).

And in its conclusion, Wachtell Lipton determined that the accounting entries were proper, were made in good faith, and were immaterial, and that there was no evidence of any material misstatement in any financial statements. DE:15:62-63.

The analysis employed by the external auditors and legal reviewers examined both the particularized detail and the holistic impact of the company's financial statements, pointing up the defective materiality analysis advocated for by the government and particularly the impact of such immaterial accounting practices on investor response to the financial statements.

Having failed to dispel the patent, powerful, and well documented exculpatory findings of the Grant Thornton and Wachtel Lipton reports, the government next seeks to excuse counsel's constitutionally deficient performance by noting, inter alia, that Mr. DiMaria has never disputed that he and his trial counsel *possessed* the reports when negotiating the plea. GBr.16. Rather than supporting the government's claims that counsel was effective, this argument shows precisely the opposite. Importantly, in contrast to the disposition of a defense new trial motion, evidence that counsel failed to exercise diligence as to material within his access does not help the government's cause where the issue is the ineffectiveness of counsel.

The effectiveness of counsel guaranteed by the Sixth Amendment is not judged on whether exculpatory tools and materials were available to him or known to his

client, but rather on whether those materials were used effectively in developing a defense and counseling his client, or whether as in this case, the materials were ignored, discarded, or misunderstood. Here, counsel was handed a plethora of hard evidence demonstrating that the questioned accounting entries were simply not and could never be material; the evidence that counsel ignored flatly contradicted the factual and legal underpinnings of the government's entire case. Despite having access to this information, counsel simply ignored it and chose not to develop it further through investigation. And, inexplicably, counsel ultimately misadvised Mr. DiMaria that materiality was a foregone conclusion or simply not relevant to the case.

The government next claims that "DiMaria *nebulously* contended before the district court that, despite having access to the above information, counsel failed to adequately investigate, but DiMaria did not specifically explain what any further investigation might have entailed." GBr.17 (internal quotation marks and citation omitted). The government's claim is unfounded and borders on fanciful and frivolous. Investigation encompasses review and analysis of the available evidence to determine its relevance in relation to the charges, all of which contained a materiality component. Investigation of the evidence and potential evidence is not limited to going out and finding additional witnesses to support the opinions and appraisals of the accounting and legal experts who found no materiality, but in sufficient review

and understanding of the known evidence to be able to convey the actual defenses to charges and the likely outcomes of trial and sentencing resolution. *See* DE:1:13 ("An attorney's responsibility is to investigate and to evaluate his client's options in the course of the subject legal proceedings and then to advise the client as to the merits of each. *Tafero v. Wainwright*, 796 F.2d 1314, 1320 (11th Cir. 1986); *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986). To impart such an understanding to the accused, counsel must, after making an *adequate and independent examination of the facts*, circumstances, pleadings and laws involved, offer his informed opinion as to the best course to be followed in protecting the interests of his client.") (citing *Walker v. Caldwell*, 476 F.2d 213, 217 (5th Cir. 1973); *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948)) (emphasis added).

Moreover, Mr. DiMaria explained in his initial petition that, in addition to the Grant Thorton and Wachtel Lipton reports, there were four other reports that counsel totally ignored or failed to comprehend. DE:1:14. Three of those reports established that Mr. DiMaria had not engaged in criminal or fraudulent conduct, and the fourth concluded that the government's loss calculations were flawed and grossly exaggerated. DE:1:14-15.

The government, to this day, has not been able to point to a single fact showing that plea counsel even read, let alone fully understood and comprehended, the

contents of the reports; nor can the government in good faith assert a single fact contradicting Mr. DiMaria's position that counsel misadvised him concerning the critical element of materiality; nor has the government seriously disputed Mr. DiMaria's contentions that any meaningful investigation utilizing the reports would have revealed:

- The rapid growth of Bankrate through numerous acquisitions, an initial public offering, a secondary public offering and a substantial bond offering created an extraordinarily complex accounting scenario involving numerous general ledger systems. Consequently, movant was placed in a position where he had to make good faith discretionary estimates and decisions on how to book revenue and expense estimates. Ultimately, all entries directed or approved by movant were shown to be either justified, simple judgmental errors and in any event, simply not material using traditional accounting metrics.

- The amounts on the so-called cushion spread sheet are not material. And the government's theory that excess expense reserves were accumulated (on the spread sheet) in good quarters so they could be reversed in bad quarters to artificially increase EBITDA (earnings before interest, taxes, depreciation, and amortization) is factually baseless given that there is no meaningful quarterly fluctuation reflected on the sheet.

- The government's theory of the case ignores the fact that the majority of the potential cushion reserves are tied to acquisitions and legitimate deal cost accruals that are separately tracked and do not impact EBITDA. Adjustments to acquisition reserves were appropriate and do not affect the EBITDA or the financial condition of Bankrate.

- Movant's interim disclosures to the auditors regarding the Management Incentive Program which were made on a total company wide basis were sufficient and complete given the expected year end changes that would have to be made when the program was fully implemented and more complete performance data concerning the separate mortgage, credit card and insurance divisions was available.

- The government's allegations concerning the alleged impropriety of movant's sale of a portion of his Bankrate stock in August 2012 are baseless. The trades occurred during an approved open window trading period, and were not based on inside information that Bankrate would underperform in the quarter or that he traded while engaged in accounting fraud that had materially inflated the company's financials. Quite simply, there was no accounting fraud and the later third quarter dip in the price of Bankrate's stock was the result of issues that had not yet arisen or were not known or envisioned at the time of the trades. There was no criminality in any aspect of movant's stock sales.

- The government characterized simple errors made by staff accountants as criminal where the error supported their narrative that operating expenses were inappropriately recorded as accrued deal costs. At the same time, the government ignored an error by the same accountant in an earlier quarter where he incorrectly overstated operating expenses that reduced EBITDA – the reason being it did not fit the government's narrative. The government likewise ignored several of the movant's accounting decisions for the same reason.

- For a number of reasons, any misstatements or omissions in representation letters sent to the auditors were simply not material. In any event, the auditors already had access to all relevant material matters purportedly not included in the letters.

- Any alleged false accounting entries were simply nonmaterial technical infractions that fell well below generally accepted accounting materiality thresholds. Moreover, these entries did not change the overall financial picture of Bankrate.

- Movant hired personnel and implemented programs to improve the accuracy of Bankrate's accounting systems.

- Approximately 97% of CFOs use "non-GAAP metrics" in making accounting decisions. This directly contradicts the government's position that accounting decisions must be irrevocably tethered to GAAP. In fact, non-GAAP measures are widely used and by definition require the exercise of management judgment and discretion and the use of estimates and projections based on existing data and/or data trends.

DE:1:15-17 (28 U.S.C. § 2255 motion addendum).

The government's final effort to rescue a conviction infected by the incompetent and constitutionally deficient performance of counsel focuses on the admissions made by Mr. DiMaria during the course of his guilty plea and that such "'solemn declarations in open court carry a strong presumption of verity.'" GBr.19 (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). The government urges that even if Mr. DiMaria's counsel performed deficiently by failing to uncover the facts Mr. DiMaria swore to in his § 2255 motion, the record demonstrates that access to those "facts" would not have changed Mr. DiMaria's fully informed decision to plead guilty following the district court's explanation of the elements of the offenses. GBr.19. The government's argument seems to suggest that Mr. DiMaria's entry of a

guilty plea somehow forecloses his right to collaterally attack his convictions and vitiates the defective performance of his counsel. That is simply not the case.

To begin with, no procedural device for the taking of a guilty plea is so perfect in design and exercise as to warrant a per se rule rendering it "uniformly invulnerable to subsequent challenge." *Fontaine v. United States*, 411 U.S. 213, 215 (1973). Accordingly, "the federal courts cannot fairly adopt a per se rule excluding all possibility that a defendant's representations at the time his guilty plea was accepted were so much the product of such factors as misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment." *Blackledge v. Allison*, 431 U.S. at 75.

In this case, Mr. DiMaria has made specific, sworn, unrebutted allegations detailing counsel's failure to adequately investigate and counsel's misadvice and misrepresentations concerning the critical element of materiality. Counsel's statements, misrepresentations, and misadvice to Mr. DiMaria regarding these matters occurred outside the confines of formal court proceedings. The Supreme Court has determined that with regard to a collateral attack on a guilty plea, where there are related statements or occurrences "outside the courtroom, and upon which the record could therefore cast no real light," summary disposition is inappropriate, and the petitioner should be entitled to the opportunity to substantiate them at an evidentiary

hearing. *Marchibroda v. United States*, 368 U.S. 487, 494-95 (1962). Here, Mr. DiMaria asks no more, and he is entitled to nothing less.

## II. THE DISTRICT COURT ERRED IN DENYING, WITHOUT AN EVIDENTIARY HEARING, MR. DIMARIA'S CLAIM THAT COUNSEL WAS INEFFECTIVE DURING THE PLEA NEGOTIATION STAGE BY FAILING TO ADVISE HIM ON HOW FINANCIAL LOSS IS CALCULATED.

The government's argument with respect to counsel's deficient performance on this issue again focuses on the admissions purportedly made in his plea agreement and during his change of plea hearing—that his crimes caused at least $25 million in losses, and that the government could prove as much beyond a reasonable doubt. GBr.21. These arguments fail given that any admissions were based upon counsel's erroneous advice concerning the appropriate methodology for calculating loss, counsel's (and hence Mr. DiMaria's) ignorance or misunderstanding of controlling decisional authority in this Circuit, and counsel's failure to comprehend factual proximate cause arguments negating the government's simplistic and fundamentally flawed loss calculations.[4]

---

[4] To begin with, Mr. DiMaria alleged without contradiction that his attorney provided ineffective representation in agreeing to waive, advising him to waive, and failing to raise at sentencing any challenge to the loss amount, despite access to information showing that there was "*insufficient evidence that any meaningful number of shareholders relied on the announcements as the basis for their decision to sell the stock*." DE:1:19-20 (emphasis added). That unrebutted factual allegation is the central

(continued...)

Apart from being unaware of, or ignoring the fundamental loss calculation principles articulated in *United States v. Stein*, counsel was ineffective in advising Mr. DiMaria to waive and not challenge the government loss amount calculations, despite counsel's knowing or having reason to know that there were other proximate cause issues undermining the government's loss calculation, including (a) that post-announcement[5] trading volume was within historical normal ranges; (b) that any drop in the price of Bankrate stock during the three-day period following the announcements fell within normal fluctuations of what had historically been a stock that exhibited daily price volatility and could not simply be attributed to the announcements; (c) that any drop in the price of Bankrate's stock following the announcements could be attributed to unrelated market forces in general, and/or factors attributable to other aspects of Bankrate's business; (d) that the 2015 restated financials were lowered because of accounting adjustments that had nothing to do with Mr. DiMaria's alleged criminal conduct; (e) that neither the 2014 or 2015 announcement identified any disputed accounting issues that could be deemed

_____

(...continued)

legal premise of this Court's holding in *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017) ("recognizing that in a securities fraud case, inflating investor loss based simply on stock price variation is fundamentally erroneous" and that "[t]he government must show that the investors relied on the fraudulent information to satisfy the 'but for' causation requirement under U.S.S.G. 2B1.1").

[5] The government focused on an announcement of accounting adjustments, replacing initial financial statement accounting determinations by Bankrate.

material and/or material to the extent they could have impacted a shareholder's decision to sell his or her shares; (f) that the impact of the disputed accounting issues on Bankrate's overall financial picture was not material and would not have influenced any investor's buy/sell decisions; (g) and that at least one expert economist had preliminarily opined that factors apart from the announcement impacted the stock price and that in any event, the post announcement fluctuations were consistent with historical normal fluctuations in the stock price. DE:1:20.

The government's efforts to explain away *Stein* and its direct relevance are unavailing. *See* GBr.22-23. Contrary to the government's contention, arguments supported fully by *Stein* were not untimely, and were in fact presented to the magistrate judge, including in the initial filing of the § 2255 motion. As we have noted above, Mr. DiMaria plainly stated in his initial filing that he received constitutionally deficient advice concerning loss calculations and focused on the argument that there was insufficient evidence establishing there was any investor reliance on the announcements as the basis of their decision to sell stock. DE:1:19-20 (explaining the prejudice of counsel's failure "advis[e] the movant to waive, and fail[ure] to raise at sentencing any challenge to this loss amount despite knowing that: (a) there was insufficient evidence that any meaningful number of shareholders relied on the announcements as the basis for their decision to sell the stock; (b) that the post

announcement trading volume was with historical normal ranges; (c) that any drop in the price of Bankrate's stock during the three-day period following the announcements fell within normal fluctuations of what had historically been a stock that exhibited daily price volatility and could not simply be attributed to the announcements; (d) that any drop in the price of Bankrate's stock following the announcements could be attributed to unrelated market forces in general and/or factors attributed other aspects of Bankrate's business; (e) the 2015 restated financials were lowered because of accounting adjustments that had nothing to do with movant's alleged criminal conduct; (f) neither the 2014 or 2015 announcement identified any disputed accounting issues that could be deemed material and/or material to the extent it could have impacted shareholders decision to sell his or her shares; (g) the impact of the disputed accounting issues on Bankrate's overall financial picture w[as] not material and would not have influenced any investors buy/sell decisions; and (h) that at least one expert economist had preliminarily opined that factors apart from the announcements impacted the stock price and in any event the post announcement fluctuations were consistent with historical normal fluctuations in the stock price"). Clearly, Mr. DiMaria is making the same arguments today that he made in his § 2255 motion.

The government's next argument is that *Stein* somehow does not apply because

it involves a conviction following a trial and a contested loss dispute at sentencing; and that the loss in this case by contrast was based on Mr. DiMaria's stipulation. GBr.23. This argument encroaches the borders of frivolousness and ignores the fundamental premise of the ineffective assistance of counsel claim—that it was constitutionally deficient representation to advise Mr. DiMaria to accept the government's loss calculations based on its flawed methodology which was devoid of any reference to the critical and indispensable element of investor reliance, and in addition, was subject to attack on other proximate causation issues.

Finally, the contention that the government's loss calculation aligned with *Stein*, *see* GBr.23, is simply wrong. Again, at no point in the district court proceedings has the government presented any facts, or even suggested the existence of evidence or analysis showing that individual investors relied on the announcements in making a decision to sell the stock. Nor could they. Several of the purported organizational victims identified by the government, including Goldman Sachs, Bank of New York Mellon, Merrill Lynch, RBC Capital Markets, Stephens Inc., and Stevens Capital Managements LP, were involved in the underwriting and promotion of the Bankrate stock offerings and were fully aware of, and had access to all information concerning any accounting irregularities that were subsequently identified or arguably referred to in either the 2014 or 2015 announcements *prior* to

the underwriting and purchasing their own shares of Bankrate stock.[6]

With regard to the prejudice prong, the government argues that even if counsel provided deficient advice regarding the loss calculation during the plea negotiation process, Mr. DiMaria cannot show that, had he received different advice, he would have rejected the plea agreement, and proceeded to trial. GBr.24. This argument lacks merit.

First, Mr. DiMaria's sworn allegations which, to date, stand factually unrebutted, establish that had he been properly advised concerning the unquestionably viable challenges to the government's loss calculations, he would not have pled guilty but rather, proceeded to trial. That is sufficient to establish prejudice. However, even assuming that Mr. DiMaria made a voluntary decision to plead guilty, which he did not, counsel's erroneous advice not to challenge, but rather accept, the government's vastly inflated loss calculation virtually assured him of the imposition of a *consecutive statutory maximum sentence* on each of the counts to which he pled guilty and the loss of the opportunity to meaningfully litigate loss amount and the proximate cause of loss.

---

[6] The government's suggestion that alleged co-conspirator Hyungin Lerner's acceptance of the same loss amount in his own case excuses Mr. DiMaria's counsel's deficient performance should summarily be rejected. If anything, this shows that Lerner's counsel was equally incompetent or, because Lerner was going to cooperate, he would accept whatever loss number the government put before him given that, ultimately, he would receive a de minimis sentence as a result of his cooperation.

## CONCLUSION

Based on the foregoing arguments and citations of authority this Court should reverse the district court's summary denial of Mr. DiMaria's § 2255 Motion and remand this case for an evidentiary hearing on both of the issues raised herein.

Respectfully submitted,

  s/ Richard C. Klugh
Richard C. Klugh, Esq.
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Tel. (305) 536-1191
rklugh@klughlaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7), I hereby certify that the foregoing brief contains 4,342 words and complies with the typeface and type-style requirement of Fed. R. App. P. 32(a)(5) and (6) because it was prepared using a WordPerfect proportionally spaced Times New Roman 14-point font.

  s/ Richard C. Klugh
Richard C. Klugh, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this brief has been electronically filed via the CM/ECF Portal and served on all interested parties on December 15, 2023.

  s/ Richard C. Klugh
Richard C. Klugh, Esq.